PEOPLE v JONES

PEOPLE v WATKINS

OPINION OF THE COURT

1. CRIMINAL LAW—EVIDENCE—EXCLUSIONARY RULE—ILLEGAL POLICE
PRACTICES—FRUIT OF THE POISONOUS TREE.

The fruit of the poisonous tree doctrine does not render inadmissible *all* evidence simply because the evidence would not have come to light but for the illegal actions of the police; the question is whether the evidence has been procured by an exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

2. CRIMINAL LAW—EVIDENCE—EXCLUSIONARY RULE—ILLEGAL POLICE
PRACTICES—REASONABLE FORESEEABILITY.

Exploitation of the primary illegality of police activity, sufficient to require the exclusion of evidence obtained by police, occurs where it was reasonably foreseeable by the police when they acted that by engaging in the illegal behavior they might obtain evidence of the kind they obtained.

3. CRIMINAL LAW—EVIDENCE—FRUIT OF THE POISONOUS TREE—OUT-
OF-COURT IDENTIFICATION.

The fruit of the poisonous tree doctrine is inapplicable to exclude a witness's out-of-court identification of a defendant, although there is a causal connection between an illegal police search of defendant's car and the witness's identification, where the police officers who engaged in the illegal behavior had no knowledge of the defendant's connection with the crime charged and could not possibly have foreseen the causal sequence leading to the witness's identification.

REFERENCES FOR POINTS IN HEADNOTES
[1, 3, 5] 29 Am Jur 2d, Evidence §§ 415, 531.
[2, 9–12] 29 Am Jur 2d, Evidence §§ 408 *et seq.*, 425–427.
[4] 75 Am Jur 2d, Trial § 184.
[6] 75 Am Jur 2d, Trial §§ 623, 907.
[7] 40 Am Jur 2d, Homicide §§ 498, 506, 534, 535.
[8] 40 Am Jur 2d, Homicide § 72.

4. CRIMINAL LAW—TRIAL—STRIKING TESTIMONY—REQUEST TO STRIKE.

A trial judge did not have a duty to strike prior testimony where the defense made no request to the court to strike the testimony.

5. CRIMINAL LAW—TRIAL—EVIDENCE—MOTION TO SUPPRESS—CONTEMPORANEOUS OBJECTION.

Objections to derivative evidence, under the fruit of the poisonous tree doctrine, must be made contemporaneously with a motion to suppress the primary evidence procured from illegal police activity.

6. APPEAL AND ERROR—INSTRUCTIONS TO JURY—TIMELY OBJECTION.

Error may not be predicated on appeal on the grounds that erroneous jury instructions were given where no timely objection was made and there is no manifest injustice.

7. HOMICIDE—FELONY MURDER—INSTRUCTIONS TO JURY.

Failure to instruct the jury on the elements of the felony underlying a felony-murder charge is not error where the felony is undisputed and the defense is misidentification.

8. HOMICIDE—FELONY MURDER—ESCAPE FROM SCENE.

A murder committed while attempting to escape from the scene of a felony is a felony murder if it is immediately connected with the underlying felony.

CONCURRENCE IN PART, DISSENT IN PART BY BRONSON, P. J.

9. CRIMINAL LAW—EVIDENCE—EXCLUSIONARY RULE—ILLEGAL POLICE PRACTICES—INDEPENDENT SOURCE—DISSIPATED TAINT.

*Evidence discovered by illegal police activity is not subject to the exclusionary rule and may be admitted where the evidence was gained from an independent source or where the causal connection between the illegal activity and the evidence is so attenuated as to dissipate the taint.*

10. CRIMINAL LAW—LINEUP—IDENTIFICATION TESTIMONY—EXCLUSION OF EVIDENCE—ILLEGAL SEARCH—INDEPENDENT SOURCE—REASONABLE FORESEEABILITY.

*Refusal to exclude testimony of a prior lineup identification of a defendant was error where the identification was derived from an illegal search, where there was no independent source for the identification, and where it was reasonably foreseeable by police that the defendant would be placed in a lineup as a result of their illegal search.*

11. CRIMINAL LAW—EVIDENCE—POLICE PRACTICES—ILLEGAL ACTIVI-
    TIES—FORESEEABILITY.

*The gaining of evidence is unforeseeable only when it is inadver-
tently uncovered; every police officer must be deemed to foresee
that incriminating evidence could result when the police take
affirmative action by following standard police investigatory
procedure.*

12. CRIMINAL LAW—EVIDENCE—POLICE PRACTICES—ILLEGAL ACTIVI-
    TIES—EXCLUSIONARY RULE—INEVITABLE DISCOVERY.

*Evidence derived from illegal police conduct is not cured of the
taint of illegality on the grounds that the evidence very likely
would have been discovered by the police without the illegal
activity.*

Appeal from Recorder's Court of Detroit, Robert
J. Colombo, J. Submitted June 10, 1975, at Detroit.
(Docket Nos. 21959, 21960.) Decided December 10,
1975. Leave to appeal applied for.

Delvin Jones, Jr., and Stanley Arno Watkins
were convicted of felony murder. Defendants ap-
peal. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *William L. Cahalan,*
Prosecuting Attorney, *Patricia J. Boyle,* Principal
Attorney, Research, Training and Appeals, and
*Raymond P. Walsh,* Assistant Prosecuting Attor-
ney, for the people.

*Carl Ziemba,* for defendants.

Before: BRONSON, P. J., and V. J. BRENNAN and
D. E. HOLBROOK, JR., JJ.

V. J. BRENNAN, J. Defendants, Delvin Jones, Jr.
and Stanley Arno Watkins, were charged with
first-degree murder contrary to MCLA 750.316;
MSA 28.548, under the felony-murder section of
that statute. They were accused of attempting to
rob Moore's Grocery Store in Detroit on February

7, 1972, with the help of a third accomplice, and causing the death of the store owner, Odell Moore, in the course of perpetrating that crime. Both defendants were found guilty of the charged offense, and were sentenced to a mandatory life sentence in prison. They appeal by right.

At the time of the attempted robbery, three persons were working at the store: Odell Moore, the victim; David Shepherd; and Doretha Horton. In addition, the victim's daughter, Linda Moore, observed the incident from the window of the upstairs living quarters. As part of an immediate police investigation, David Shepherd and Doretha Horton were called down to the station to observe a lineup on February 10, 1972. Neither defendant was in the lineup, and the witnesses could not identify any of the persons in the lineup as being involved in the attempted robbery. Later, on March 9, 1972, David Shepherd was shown a series of photographs, but was unable to make an identification. None of these photographs depicted either defendant.

Some time after these identification procedures, Mrs. Horton recognized defendant Watkins at a bowling alley. She hurried away as she was frightened, but she did not call the police. At trial, Mrs. Horton explained that she did not know the man's name or where he lived, so she decided that it would do no good to inform the police. The police had no contact with Jones or Watkins until November 14, 1972. On that date, Watkins' car was stopped by two Detroit police officers for defective brake lights. After Watkins and his companion, later identified as Kenneth McCrary, were ordered out of the car, the car was searched. That search produced two pistols hidden under the front seat, and Watkins and McCrary were arrested for carrying concealed weapons.

The police ran ballistics tests on the two weapons found in the car and determined that one was an automatic pistol of the same caliber as used in the killing and attempted robbery of Moore's Grocery Store. Consequently, while they were still in custody on the concealed weapons charge, McCrary and Watkins were placed in a lineup to be viewed by David Shepherd and Doretha Horton. David Shepherd was unable to identify anyone, but Mrs. Horton picked out defendant Watkins. Jones was not in this lineup.

Defendant Jones was not linked to this crime until January of 1974. At that time, a Ronnie Agar was stopped by the police for driving without an operator's license. When he was questioned by the police as to the attempted robbery and killing at the grocery store, he implicated Jones and Watkins. Agar told the police that he had been parked a couple of blocks from Moore's Grocery Store on February 7, 1972, when three men came running up to the car. He immediately recognized Jones, whom he had known for many years through school, and Watkins, whom he knew only by sight. One of the three men said that "we just blew someone away" in the "store". Agar stated that there was but one "store" in the area— Moore's Grocery Store. Agar drove the three men to a friend's house, and never informed the police of this episode until picked up for the traffic violation.

The police attempted to locate defendant Jones, and finally did so in May, 1974. He was taken into custody, and a lineup was held on June 4, 1974. David Shepherd and Doretha Horton, viewing the lineup separately, both identified Jones. Watkins was not in this lineup.

At trial, the details of the crime were estab-

lished. A young man entered the grocery store in
the early evening hours of February 7, 1972, asked
Odell Moore if liquor was sold there, and left when
Mr. Moore replied that it was not. Mrs. Horton
identified defendant Watkins at trial as that indi-
vidual. She also testified that she had picked out
Watkins at the November 17, 1972 lineup. David
Shepherd was unable to identify the person who
first came into the store.

A few minutes later, Watkins returned to the
store accompanied by two other young men. These
three individuals went to the beer cooler, picked
up some beer, and brought it to the front counter.
Since the two persons accompanying Watkins ap-
peared to be under 18, Mrs. Horton asked for
identification. At that point, all three pulled guns
and announced a holdup. Mrs. Horton was told to
lie down on the floor behind the counter, and she
did so.

Without any apparent provocation, two of the
robbers turned toward Odell Moore and proceeded
to fire six or seven shots at him. Two bullets hit
Mr. Moore. The third robber fired a shot at Linda
Moore, the owner's daughter, as she opened the
window overlooking the store upon hearing the
initial shots. Linda Moore, David Shepherd, and
Mrs. Horton all identified defendant Jones at trial
as that third robber. Shepherd and Mrs. Horton
also testified that they had picked Jones at the
June 4, 1974 lineup.

Jones turned toward David Shepherd after firing
a shot at Linda Moore, pointed his gun, and pulled
the trigger twice. Fortunately for Mr. Shepherd,
the gun did not fire either time. At that point, all
three robbers fled the scene. Mr. Moore and David
Shepherd gave chase, but were unable to catch the
three individuals. Mr. Moore was taken to the
hospital, where he died from the gunshot wounds.

During the trial, Ronnie Agar related the story
that he had first told the police in January of
1974. In addition, Kenneth McCrary and the ar-
resting officer testified as to the November 14,
1972 arrest of McCrary and defendant Watkins,
and as to the subsequent search of the automobile
in which they were riding. Prior to the testimony
of the other Detroit police officer who participated
in that arrest, defense counsel moved to suppress
from evidence the pistol found in the search on
grounds that it had been seized pursuant to an
illegal arrest. Defense counsel also moved to have
all ballistics tests linking that pistol to casings
found at the scene of the crime suppressed. An
evidentiary hearing was held outside the presence
of the jury, at which the second officer testified as
to the arrest and subsequent search.

The trial judge ruled that McCrary and Watkins
were searched pursuant to what was merely a
pretext arrest. Consequently, the judge suppressed
the pistol from evidence and any testimony linking
that pistol to the crime. Defense counsel made no
motions to strike the prior testimony of Kenneth
McCrary and the first arresting officer pertaining
to the arrest and search. The trial judge did not
*sua sponte* strike that prior testimony. The attor-
ney for Watkins did move to strike the identifica-
tion testimony of Mrs. Horton on grounds that it
was the "fruit" of the illegal arrest of defendant
Watkins. The trial judge denied that motion, con-
cluding that Watkins would have been placed in a
lineup pursuant to other evidence in possession of
the police even if he had never been arrested on
the traffic charge.

Defendant Jones called only one defense witness.
Ronnie Agar had testified that he was with Sam
Johnson, Jr. when he spoke to the defendants on

the night of the killing. Jones called Johnson to the stand, and Johnson testified that he was in prison on that date, February 7, 1972. Defendant Watkins was called to the stand to establish his defense. Watkins denied participation in the robbery, stating that he was working at Chrysler Sterling Stamping Plant at the time of the attempted robbery. Both defendants rested their cases, and the jury returned a verdict of guilty as charged.

Defendant Watkins contends on appeal that the trial judge improperly refused to suppress the lineup identification of Mrs. Horton on grounds that it was the "fruit" of his illegal arrest.

The fruit of the poisonous tree doctrine seeks to discourage unlawful police practices by depriving the people of advantages flowing from the illegality. *People v Roderick Walker,* 27 Mich App 609; 183 NW2d 871 (1970). The United States Supreme Court has observed that a rigid and unthinking application of the exclusionary rule, of which the "fruit of the poisonous tree" doctrine is but one facet, "in futile protest against practices which it can never be used effectively to control, may exact a high toll in human injury and frustration of efforts to prevent crime". *Terry v Ohio,* 392 US 1, 13–15; 88 S Ct 1868; 20 L Ed 2d 889 (1968). In *Wong Sun v United States,* 371 US 471; 83 S Ct 407; 9 L Ed 2d 441 (1963), the Court expressly refused to hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light "but for the illegal actions of the police". The question which must be asked is whether the evidence has been procured by an exploitation of the illegality of the police or instead by means sufficiently distinguishable to be purged of the primary taint. *Wong Sun v United*

*States,* 371 US at 488; 83 S Ct at 417; 9 L Ed 2d at 455. Clearly, a showing that the evidence would not have been obtained "but for" the illegal activity of the police is insufficient in itself to require exclusion under the rule. Even though sophisticated argument may be able to show a causal connection between the illegal activity of the police and the evidence procured, "[a]s a matter of good sense, however, such connection may have become so attenuated as to disipate the taint". *Nardone v United States,* 308 US 338, 341; 60 S Ct 266; 84 L Ed 307 (1939). The crucial question, therefore, is whether the people have exploited the primary illegality. This Court in discussing this matter has stated:

"Various approaches have been taken by the courts in deciding whether in particular cases the people have taken advantage of or exploited the primary illegality. One test, suggested by some commentators and applied by some courts, which makes sense to us, is whether it was reasonably foreseeable by the police when they acted that by engaging in the illegal behavior they might obtain evidence *of the kind they obtained." People v Roderick Walker,* 27 Mich App 609, 617; 183 NW2d 871 (1970). (Emphasis added.)

In the instant case an illegal police search produced firearms. At the time of the search, the officers had no knowledge that defendant Watkins was in any way connected with the murder of decedent some months earlier. A routine ballistics check on the firearm showed that it could have been the murder weapon. This prompted the police to call witnesses to attend a lineup to determine if they could identify Watkins as the felon. This in turn resulted in the out-of-court identification. We hold that the arresting police officers could not possibly have foreseen the causal sequence in-

volved, and thus that the "fruit of the poisonous tree" doctrine is inapplicable. We should point out that this is not a case where an identification of a suspect is tainted by a prior illegal occurrence. There is no suggestion that the lineup was in any way improper. The witness had observed defendant at the scene of the crime and had later recognized him at a bowling alley. The illegal search was in no way the source of her ability to recognize defendant Watkins in the courtroom. The question, rather, is whether the exclusion of the out-of-court identification under these circumstances will serve the public policy of deterring illegal police conduct. Clearly, the police cannot be deterred by circumstances which they cannot foresee. This Court in *People v Tucker,* 19 Mich App 320, 328; 172 NW2d 712 (1969), quoted with approval from the dissent in the case of *People v Peacock,* 29 App Div 2d 762, 763; 287 NYS2d 166, 167–168 (1968), as follows:

"It is our view that to extend the exclusionary rule to the testimony of such complainant would tend to undermine the doctrine's primary design to protect the innocent and relegate it to the less commendable function of providing technical loopholes for the benefit of the guilty. To subscribe to this would be to discourage and frustrate thorough and expeditious investigations, lest the authorities find themselves the victims of their own efficiency."

We think the same reasoning is applicable to the case at bar. The trial judge did not err in admitting into evidence testimony of the witness's out-of-court identification.

Both defendants contend that the trial judge committed reversible error by failing to *sua sponte* strike the testimony of Kenneth McCrary and a

police officer concerning the arrest of McCrary and defendant Watkins. That testimony had come into evidence without objection prior to the motion to suppress, and defense counsel at no time requested the trial court to strike that testimony. We hold that the trial judge was under no duty to strike this prior testimony without a defense request to do so.

Objections to derivative evidence must be made contemporaneously with the motion to suppress the primary evidence, *People v Willis,* 46 Mich App 436; 208 NW2d 204 (1973), *People v Briscoe,* 51 Mich App 153; 214 NW2d 877 (1974). The *Willis* Court applied that rule to facts very similar to the ones we have here. The police stopped Willis for speeding, and arrested him when he could not produce a registration for a car. The car was then searched, and two pistols and a large quantity of stolen furs were found. Those items were suppressed at a pretrial hearing because the arrest was ruled illegal, but the police officer testified as to the arrest and a subsequent photographic identification at trial. Willis objected to the police officer's testimony for the first time on appeal, and the *Willis* Court concluded:

"This argument, an adaption of the 'fruit of the poisonous tree doctrine' was not raised at or before trial.

\* \* \*

"Whatever the merits of defendant's theory, the facts necessary to support its application are not present in the record, nor has the prosecution been called upon to respond. We see no reason why any such theory could not have been presented contemporaneously with the motion to suppress the other evidence, as required by *People v Childers,* 20 Mich App 639 [174 NW2d 565] (1969); *People v Matthews,* 22 Mich App 619 [178 NW2d 94] (1970). Consequently, we see no reason to delve into

the intricacies of defendant's unsupported theory." 46 Mich App at 439.

Under similar facts, we follow that rule here.

It should be noted that it is quite likely that defense counsel failed to move to strike this testimony as part of a deliberate trial strategy. The ballistics tests directly linking the gun to the grocery store killing were never allowed into evidence. Consequently, defense counsel may well have felt that the best course would be to let the testimony stand so that the jury would not become suspicious that the items found pursuant to the arrest had special significance.

The remaining errors raised by the defendants relate to the jury instructions. Neither defense counsel objected to the instructions after they were given.[1] Absent manifest injustice, error may not be predicated on appeal on the grounds that erroneous jury instructions were made where no timely objection was entered below, *People v Wilbourne,* 44 Mich App 376; 205 NW2d 250 (1973), *People v Peace,* 48 Mich App 79; 210 NW2d 116 (1973), *People v Bradley,* 54 Mich App 89; 220 NW2d 305 (1974). We hold that no showing of manifest injustice has been made here. However, since we further find that the instructions given were in fact quite proper, we shall discuss the alleged errors individually.

Defendants first argue that it was improper for the trial judge to fail to instruct the jury on the

---

[1] The record below indicates the following exchange:

*"The Court:* Very well, the record will reflect that. To eliminate asking you gentlemen tomorrow morning, anything further on the Court's charge?

*"Mr. Foley:* Nothing on behalf of the people.

*"Mr. Sapala:* Nothing.

*"Mr. Taft:* Defendant Watkins is extremely satisfied with the charge."

elements of the underlying felony, robbery, on which the felony-murder charge was based. We disagree. At trial, as summarized in the statement of the facts above, the testimony establishing an attempted robbery was undisputed. All of the pertinent witnesses testified that defendants entered the store, pulled guns, and announced a holdup. The defense theory was solely one of misidentification. In those circumstances, the following rule applies:

"The sole controversy in the case was over *who* committed the crime charged. Absent a request to charge or objection to the charge, we rule it was not reversible error to charge the jury in accord with the defendant's theory of defense." *People v Bohm,* 49 Mich App 244, 255; 212 NW2d 61 (1973).

The instruction given was perfectly proper.[2]

Defendants next argue that the trial judge improperly refused to instruct on the lesser included offenses to murder in the first degree. At present, there exists a split in the panels of this Court as to the proper rule to apply to this type of situation. One line of cases takes the position that no lesser included offenses to felony murder are ever properly chargeable. See *People v Livingston,* 57 Mich App 726; 226 NW2d 704 (1975), and the cases cited therein. The other line of cases holds that the trial court must instruct on lesser included offenses

---

[2] The recent case of *People v Reed,* 393 Mich 342; 224 NW2d 867 (1975), does not change the *Bohm* rule. *Reed* only holds that where there is a factual dispute as to an element of the crime, even if the defense is entirely one of misidentification, the trial judge cannot rule *as a matter of law* that such element exists.

We also find *People v Skowronski,* 61 Mich App 71; 232 NW2d 306 (1975) (per KAUFMAN, J.), inapplicable here. The Court in that case found that failure to instruct on the underlying felony to be one of six errors in total constituting reversible error. However, in *Skowronski* there was a real dispute as to whether the underlying felony, attempted robbery, had occurred.

upon request when the evidence warrants such instructions. See *People v Smith,* 55 Mich App 184; 222 NW2d 172 (1974), and the cases cited therein. Since we determine that no evidence was presented at trial to support a charge on lesser included offenses, we need not add one more decision to either line of cases.

The Court in *People v Smith, supra,* stated the "no evidence" rule in the context of a felony-murder charge:

"*Bufkin [People v Bufkin,* 43 Mich App 585; 204 NW2d 762 (1972)] relies primarily on *People v Dupuis,* 371 Mich 395; 124 NW2d 242 (1963). This reliance is not so much misplaced as it is overplaced. In *Dupuis* the Court refused to instruct on lesser offenses, charging the jury that defendant was either guilty of first degree murder or he was innocent. However, in that case *'the undisputed proofs showed that the murder was committed in the perpetration of a robbery'. Dupuis,* 371 Mich 401; 124 NW2d 245. We do not quarrel with this holding. But we think it is wrong to extend its application, as *Bufkin* did, to all cases, regardless of the factual setting, in which felony murder is charged." 55 Mich App at 187. (Emphasis added.)

Applying that rule here, it is clear that all of the proofs showed that the killing occurred while the robbery was taking place. Defendants' counsel on appeal argues that since the deceased ran after the robbers and witnesses did not see that he was bleeding before he left the store, the deceased could have been shot outside the store. Even if that interpretation of the testimony is deemed possible, which we doubt, it would be of little help to defendant. A murder committed while attempting to escape from the scene of a felony is felony murder if it is "immediately connected" with the underlying felony, *People v Smith, supra.* Such

was the case here. Therefore, there was absolutely no evidence to support a charge on lesser included offenses, and the trial judge properly refused to do so.

Defendants finally allege that the instructions did not convey to the jury the idea that the killing must be "part" of the robbery and "in furtherance" of it. In his final instructions, the trial judge read the information and the first-degree murder statute to the jury. He then instructed them as follows:

"It is the prosecution's theory in this case that Mr. Odell Moore was killed *in the perpetration or attempt to perpetrate an armed robbery* within the meaning of the Michigan Statutes.

"The unlawful killing of a human being whether intentional, unintentional or accidental which occurs *as a result of the commission of or attempt to commit the crime of robbery* and there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the first degree. The specific intent to commit robbery in the commission or attempt to commit such crime must be proven beyond a reasonable doubt.

"If a human being is killed by any one of several people jointly engaged at the time of such killing *in the perpetration of or attempt to perpetrate the crime of robbery* and if the killing is done *in furtherance of a common design and agreement to commit such crime or is an ordinary and probable result of the pursuit of that design and agreement,* all such persons so jointly engaged are guilty of murder in the first degree whether the killing is intentional, unintentional or accidental." (Emphasis added.)

That instruction fully complied with the applicable law. See *People v Goree,* 30 Mich App 490, 495; 186 NW2d 872 (1971), *People v Smith,* 56 Mich App 560; 224 NW2d 676 (1974).

Defendants raised one additional issue which does not merit discussion.

Defendants Watkins' and Jones' convictions are affirmed.

D. E. HOLBROOK, JR., J., concurred.

BRONSON, P. J. *(concurring in part, dissenting in part).* I would hold that Mrs. Horton's testimony at trial as to her identification of defendant at a pretrial lineup should have been suppressed as the "fruit" of the pretext arrest of Watkins. I vote to reverse the conviction of Watkins. Since I agree with the majority on the other issues, I vote to affirm defendant Jones' conviction.

The majority has added one more opinion to those that talk in generalities about the "fruit of the poisonous tree" doctrine. Although the usual "exploitation of the illegality" and "dissipation of the taint" language is employed, the result is clearly reached because the majority views this doctrine as "providing technical loopholes for the benefit of the guilty". I think that well-defined standards must be employed in reviewing a claim that certain evidence is the "fruit" of some illegal police activity.

The "fruit of the poisonous tree" doctrine is but one facet of the exclusionary rule. It was developed as a response to the realization that if police officers may use the knowledge gained from unlawfully obtained evidence to obtain the same or other important evidence legally, an inducement to commit such unlawful practices continues to exist.[1] Yet deterrence is not the only important factor. As presented in Pitler, *"The Fruit of the Poisonous*

---

[1] Note, *Fruit of the Poisonous Tree—A Plea for Relevant Criteria,* 115 U of Pa L Rev 1136, 1138 (1967).

*Tree" Revisted and Shepardized,* 56 Cal L Rev 579, 586–588 (1968), a balancing of several relevant considerations is necessary in determining the scope of this doctrine:

"The complete exclusion—in all situations and for all purposes—of second and subsequent generation 'fruits' of illegally obtained evidence seems logical and warranted unless there are competing considerations to restrict the radiations of the exclusionary rule. The obvious competing consideration, in criminal as well as civil cases, is the policy of admitting relevant and trustworthy evidence in order to maximize the search for truth. In criminal prosecutions the exclusionary rule conflicts with another interest of society—convicting the guilty. Hence, departures 'from the primary evidentiary criteria of relevancy and trustworthiness must be justified by some strong social policy.' Even Judge Skelly Wright, a vigorous supporter of a strong exclusionary rule, recognizes that 'though harsh penalties [for illegal police activities] are appropriate . . . we cannot ignore the public safety in our attempt to correct police wrongdoing.' The policies of admitting relevant and reliable evidence and convicting the guilty create a shield to repel the exclusionary rule's radiations.

\* \* \*

"In most situations where evidence is excluded in order to deter unlawful police conduct, the defendant is not thereby granted immunity from prosecution. As long as the illegally obtained evidence is not used, the defendant may be prosecuted based on independently secured evidence. If it is necessary and socially desirable to deter official illegality then why not provide the severest sanction possible—immunity from prosecution —for victims of illicit police practices? Such immunity, however, sometimes permits an otherwise guilty man to go free. The answer to the problem cannot be given in terms of pure logic, but it is nevertheless logical. For although society seeks to deter illicit police practices, it does not wish to create an even greater evil. Exclusion of reliable evidence may be an evil but absolute immu-

nity from prosecution is too high a price to pay to deter illegal police conduct." (Footnotes omitted.)

The origins of the "fruit of the poisonous tree" doctrine are found in the early case of *Silverthorne Lumber Co v United States,* 251 US 385; 40 S Ct 182; 64 L Ed 319 (1920). There, federal officers unlawfully seized certain documents belonging to the Silverthornes. A district court ordered the return of these documents, but the officers made photocopies of the originals before they were returned. On the basis of the photocopies, the prosecutor sought to subpoena the originals for use at trial. The Supreme Court rejected the use of such derivative evidence.

Justice Holmes, writing for the *Silverthorne* Court, emphasized the deterrence factor in formulating a rule dealing with derivative evidence:

"The proposition could not be presented more nakedly. It is that although of course its seizure was an outrage which the Government now regrets, it may study the papers before it returns them, copy them, and then may use the knowledge that it has gained to call upon the owners in a more regular form to produce them; that the protection of the Constitution covers the physical possession but not any advantages that the Government can gain over the object of its pursuit by doing the forbidden act. *Weeks v. United States* [citation omitted], to be sure, had established that laying the papers directly before the grand jury was unwarranted, but it is taken to mean only that two steps are required instead of one. In our opinion such is not the law. It reduces the Fourth Amendment to a form of words. [Citation omitted.] The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." 251 US at 391–392.

Yet Holmes then formulated the "independent
source" limitation in recognition of competing soci-
etal interests:

> "Of course this does not mean that the facts thus
> obtained become sacred and inaccessible. If knowledge
> of them is gained from an independent source they may
> be proved like any others, but the knowledge gained by
> the Government's own wrong cannot be used by it in
> the way proposed." 251 US at 392.

That "independent source" limitation has been
followed in subsequent cases, and is the primary
method by which the "taint" of illegal police activ-
ity is removed from facts discovered through that
activity. See, for example, *Nardone v United
States,* 308 US 338; 60 S Ct 266; 84 L Ed 307
(1939); *United States v Wade,* 388 US 218; 87 S Ct
1926; 18 L Ed 2d 1149 (1967).

One further limitation on the "fruit of the poi-
sonous tree" doctrine has been formulated by the
courts. Justice Frankfurter recognized in *Nardone
v United States, supra,* that the deterrence value
of excluding evidence resulting from illegal police
activity may be small even though that evidence
was not derived from an "independent source".
Consequently, a second limitation on the doctrine
was established:

> "Here, as in the *Silverthorne* case, the facts improp-
> erly obtained do not 'become sacred and inaccessible. If
> knowledge of them is gained from an independent
> source they may be proved like any others, but the
> knowledge gained by the Government's own wrong
> cannot be used by it' simply because it is used deriva-
> tively. [Citation omitted.]
>
> "In practice this generalized statement may conceal
> concrete complexities. Sophisticated argument may
> prove a causal connection between information obtained

through illicit wire-tapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint." 308 US at 341.

The *Nardone* limitation was reformulated many years later in *Wong Sun v United States,* 371 US 471; 83 S Ct 407; 9 L Ed 2d 441 (1963). Therein, the following standard was articulated by the Court:

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " 371 US at 487–488.

The language used by the Supreme Court in *Nardone* and *Wong Sun* to define this second limitation was quite general, but it at least clearly set forth the philosophy behind that limitation. The purpose of the exclusionary rule is to deter future illegal police activity, and it was felt that the exclusion of evidence which was so remotely connected with that illegality would have no such effect.

The Michigan courts have taken this general limitation and formulated a rule to apply in specific situations. This Court, in *People v Roderick Walker,* 27 Mich App 609; 183 NW2d 871 (1970), adopted the "reasonably foreseeable" test. Judge (now Justice) LEVIN, writing for the Court, stated:

"Various approaches have been taken by the courts in deciding whether in particular cases the people have

taken advantage of or exploited the primary illegality. One test, suggested by some commentators and applied by some courts, and which makes sense to us, is whether it was reasonably foreseeable by the police when they acted that by engaging in the illegal behavior they might obtain evidence of the kind they obtained. Physical evidence is the reasonably foreseeable product of a search; responsive statements are the reasonably foreseeable product of interrogation.

"If one starts with the premises that all evidence derived illegally will not necessarily be suppressed and that the purpose of the exclusionary rule is to discourage unlawful police practices, then it clearly is important to consider as a factor whether suppression of the derivative evidence in the case at hand is likely to deter repetition of the illegal behavior. In our opinion, a police officer, aware of the illegality and, nevertheless, willing to engage in the illegal practice, will not be deterred by the suppression of evidence that he could not have anticipated obtaining when he indulged in the prohibited practice." 27 Mich App at 617. (Footnotes omitted.)

That test was subsequently applied in *People v Weaver,* 35 Mich App 504; 192 NW2d 572 (1971), *People v Henry Robinson,* 37 Mich App 115; 194 NW2d 537 (1971), *aff'd,* 388 Mich 630; 202 NW2d 288 (1972) (majority approving Judge LEVIN's concurring opinion setting forth the test), and *People v Carter,* 43 Mich App 735; 204 NW2d 703 (1972).

From the foregoing analysis, it is clear that we must determine two things here in order to review defendant Watkins' claim that the lineup was the "fruit" of the illegal arrest. First, we must determine if the lineup identification was derived from an "independent source". Secondly, we must determine whether it was not "reasonably foreseeable" by the police when they illegally arrested the defendant that a lineup would be held after defendant was taken into custody. If we answer

either inquiry in the affirmative, the evidence need not be excluded as the "fruit of the poisonous tree".

There is little doubt that the lineup identification by Mrs. Horton several days after Watkins was illegally arrested was derived from the illegal arrest and not an "independent source". At that time, the only link between Watkins and the killing at the store was the illegally seized gun. Mrs. Horton had seen Watkins at a bowling alley prior to this time, but the police had no knowledge of such. This is not the situation where a suspect is illegally arrested and put in a lineup because they had planned to do so in any case, based upon independent evidence. The lineup here was held solely because of evidence illegally seized from defendant.

It is true that the police very likely "would have" placed defendant Watkins in a lineup soon after Ronnie Agar implicated him in the killing. That fact is unimportant here. Some courts have extended the "independent source" rule to be an "inevitable discovery" rule. Evidence derived from illegal police conduct is then admissible if it "would have" been discovered even absent that illegal activity, *Wayne v United States,* 115 US App DC 234; 318 F2d 205 (1963), *cert den,* 375 US 860; 84 S Ct 125; 11 L Ed 2d 86 (1963), *People v Weaver, supra* (Judge LEVIN's opinion with Judge [now Justice] FITZGERALD concurring in result only.[2] I would reject that rule as a proper one. It has no basis in United States Supreme Court cases, and is contrary to the deterrence function of the exclusionary rule. As stated in *United States v Paroutian,* 299 F2d 486, 489 (CA 2, 1962):

[2] *See also,* the cases cited in Note, *The Inevitable Discovery Exception to the Constitutional Exclusionary Rules,* 74 Colum L Rev 88 (1974).

"If information which could have emerged from an unlawful search in fact stems from an independent source, the evidence is admissible. [Citations omitted.] On the other hand, a showing that the government had sufficient independent information available so that in the normal course of events it might have discovered the questioned evidence without an illegal search cannot excuse the illegality or cure tainted matter. Such a rule would relax the protection of the right of privacy in the very cases in which, by the government's own admission, there is no reason for an unlawful search. The better the government's case against an individual, the freer it would be to invade his privacy. We cannot accept such a result. The test must be one of actualities, not possibilities."

Even if we could say that the police here "would have" held a lineup upon Ronnie Agar's information, that factor has no place in this analysis.[3]

Going on to the second part of the test, I would also hold that it was "reasonably foreseeable" by the police that defendant would be placed in a lineup. The reasoning in *People v Roderick Walker, supra,* is particularly persuasive. In that case, the Court held that it was not foreseeable that the police would inadvertently see blood of the type of a murder victim on defendant's shoes. However, in discussing the type of evidence which would be foreseeably obtained as the result of the illegal conduct, the Court stated:

"If Walker had been required to remove any clothing,

---

[3] We should also note that the "inevitable discovery" rule simply has no application to lineup identifications. While a piece of evidence, such as the gun used in the crime, remains unchanged over time, every identification is different. Thus, while the police might have held *an* identification almost one and one-half years later (when the Jones lineup was held pursuant to the information given by Agar), that is not the *same* identification procured by the illegal arrest of defendant. We cannot say that the police would have "inevitably discovered" the same evidence they received after the illegal arrest of Watkins.

an entirely different question would be presented. It would be difficult to distinguish the discovery of evidence following removal of clothing from the acquisition of evidence through interrogation, fingerprinting *or as a result of a lineup identification,* in which kinds of cases evidence has been excluded where it was derived from an illegal detention or other prohibited action. But in all those cases not only was it reasonably foreseeable that the illegal activity might result in the acquisition of evidence, through the means of interrogation, fingerprinting or *lineup identification,* but it was also necessary for the police to take affirmative action to exploit the primary illegality; to question, to fingerprint, *to place the accused person in a lineup* or to require the removal of clothing." 27 Mich App at 618–619. (Footnotes omitted, emphasis added.)

Here, the police took the gun seized, ran ballistics tests on it, and compared the gun with bullets found at the scene of the killing. It was entirely foreseeable that defendant would be placed in a lineup to be viewed by witnesses to that killing.

The majority concludes that the arresting officers had no knowledge of Watkins' involvement in the grocery store killing, making a later lineup held in regard to the killing unforeseeable. In doing so, the majority misconstrues the *Walker* test. The gaining of evidence is unforeseeable only when it is inadvertently uncovered. When the police take "affirmative action" by following standard police investigatory procedure, every police officer must be deemed to foresee that incriminating evidence could result. The foreseeability test does not save the evidence here.

The trial judge improperly refused to exclude the testimony of Mrs. Horton that she identified defendant Watkins at the lineup held shortly after his illegal arrest. She was the only eyewitness who

could identify Watkins. Therefore, I cannot say that this error was harmless beyond a reasonable doubt under the test in *People v Roberson,* 55 Mich App 413; 222 NW2d 761 (1974).