PEOPLE v LAMBERT

Docket No. 100239. Submitted April 13, 1988, at Grand Rapids. Decided February 6, 1989.

Darius Earl Lambert was convicted on a plea of guilty of breaking and entering an unoccupied building, a garage, with intent to commit larceny, Manistee Circuit Court, James M. Batzer, J. Defendant's plea was tendered and accepted on the condition that he be allowed to raise on appeal issues related to the trial court's denial of motions to suppress evidence of the items missing after the break-in in question and evidence of inculpatory statements made by defendant to the police following his arrest. Defendant appealed.

The Court of Appeals *held:*

1. The initial contact with defendant made by two deputies of the Manistee County Sheriff was the result of an unlawful stop of the van defendant was driving shortly after the break-in in question. The deputies, by their own admission, had decided to stop defendant merely to ask him if he had seen any vehicles in the vicinity. However, an individual approached by a police officer in a public place may properly decline to answer the officer's questions. Additionally, at the time of the stop the deputies had no reasonable, articulable suspicion that defendant had committed or was about to commit a crime. Thus, the initial stop of defendant cannot be deemed to have been lawful. However, after defendant pulled over and stopped, the deputies immediately recognized defendant as an individual on whom arrest warrants were outstanding and they placed defendant in custody. While in custody, defendant admitted the break-in and consented to a search of his van, which yielded items missing from the scene of the break-in. Thus, while the initial stop may have been unlawful, the recognition of defendant as an individual properly subject to arrest provided the deputies with grounds on which to make a lawful arrest and the evidence obtained thereafter was properly admissible at trial and the

REFERENCES

Am Jur 2d, Searches and Seizures §§ 33, 37, 39.

See the Index to Annotations under Arrest; Automobiles and Highway Traffic; Search and Seizure.

trial court's denial of defendant's motion to suppress that evidence was proper.

2. The trial court did not err in refusing to suppress evidence of defendant's inculpatory statements. Defendant was adequately advised of his *Miranda* rights, but he waived them. Furthermore, defendant's statements were voluntary.

Affirmed.

SAWYER, J., concurred separately to state his disagreement with the majority's conclusion that the initial stop of defendant was unlawful. Judge SAWYER would hold that the deputies could have reasonably suspected that defendant was involved in criminal activity from defendant's evasive actions of accelerating away from the deputies after the deputies began following him and of not immediately coming to a stop after the deputies turned on the overhead lights on their vehicle. Judge SAWYER agreed that defendant's other claim on appeal is without merit.

SEARCHES AND SEIZURES — UNLAWFUL ARRESTS — SUBSEQUENT LAWFUL ARRESTS — EVIDENCE.

Where the police have unlawfully stopped or detained a person and then discover that the person detained is the proper subject of a lawful arrest on grounds other than the original illegal stop, any evidence obtained as a result of the lawful arrest, which evidence is not the result of an exploitation of the initial illegal stop, is properly admissible at trial.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Dennis M. Swain,* Prosecuting Attorney, for the people.

*Marian Kromkowski,* for defendant on appeal.

Before: SHEPHERD, P.J., and SAWYER and K. I. MACDONALD,* JJ.

SHEPHERD, P.J. Defendant pled guilty to breaking and entering an unoccupied building with intent to commit larceny, MCL 750.110; MSA 28.305. His guilty plea was conditioned upon being allowed to raise on appeal issues related to the trial court's denial of certain pretrial motions to

---

* Circuit judge, sitting on the Court of Appeals by assignment.

suppress evidence. Defendant was sentenced to serve 2½ to 10 years in prison. He appeals as of right. This case raises the question of whether, after improperly detaining a citizen and then discovering that they have a valid basis for making an arrest, the police may make the lawful arrest and properly obtain evidence that flows from such an arrest. We hold that they may do so and, therefore, we affirm.

At approximately 5:30 A.M. on July 24, 1986, two Manistee County Sheriff's deputies, Dale Kowalkowski and Douglas Cermak, responded to a silent alarm from a garage located in rural Manistee County. The deputies arrived on the scene fifteen to twenty minutes later and discovered that the garage had been broken into and that one or more all-terrain vehicles may have been removed. The deputies left the scene and drove north, looking into the woods for evidence of the vehicles. At approximately 6:00 A.M., the deputies saw a van traveling south. They decided to stop the van to determine if the driver saw any vehicles in the area. At that point, neither the driver nor the van was suspected of having been involved in the break-in and the deputies admit that they had no probable cause to believe that the van or its driver had been involved in any crime.

As the deputies made a U-turn to pursue the van, the van accelerated. The deputies accelerated to pursue the van, but the van continued to accelerate and pull away from them. At that point, the deputies activated their overhead lights and the van pulled to the side of the road. The deputies approached the vehicle and Deputy Kowalkowski recognized the driver as defendant. Kowalkowski was aware that there were two or three outstanding bench warrants for defendant's arrest and, accordingly, placed defendant under arrest on

those warrants. The deputy summoned a tow truck to impound the van, apparently on the basis that it had been determined that there was no insurance covering the van.

While seated in the back of the patrol car, defendant said to Deputy Cermak that he had broken into the garage and that items stolen from the garage were in the back of the van. At this point, Deputy Cermak advised defendant of his constitutional rights, after which defendant again stated that he had been involved in the break-in and that he had cut a hole in the garage door and removed items from the garage. Defendant then gave the deputy permission to search the van. A search of the van revealed fruits of the crime. Sometime later, after defendant had been brought to the police station, he was turned over to a detective for questioning, was again advised of his constitutional rights, and he again gave an inculpatory statement.

On appeal, defendant claims that the trial court erred in refusing to suppress the physical evidence seized from the van on the basis that the initial stop of defendant by the deputies was without probable cause or reasonable suspicion and, therefore, the evidence found pursuant to the search were fruits of the poisonous tree. At the suppression hearing below, the trial court ruled to admit the physical evidence because the deputies' actions were lawful.

Initially, we note that a trial court's ruling at a suppression hearing will not be disturbed unless it is clearly erroneous. *People v Payton,* 166 Mich App 428, 430; 421 NW2d 191 (1988). The narrow questions we must decide in reviewing the court's decision here are whether the initial stop of the van was lawful and whether the evidence seized as a result of the stop was inadmissible as the fruit of

the poisonous tree. We answer both questions in the negative.

In reviewing the lawfulness of the stop, it is important to note that the record does not indicate that defendant violated any traffic laws or was stopped for this purpose. Although he did not do so immediately, defendant nevertheless pulled over to the side of the road after the deputies activated the overhead lights of their vehicle. The evidence indicated that the officers knew two things when they activated the lights to stop defendant: (1) that they wanted to ask defendant whether he had any information that would assist them in their investigation of a recent crime; and (2) that defendant drove evasively while being "chased" by the deputies before they signaled him to stop.

The first ground did not provide the deputies with authority to stop defendant as a citizen has no duty to stop and answer questions when approached by a police officer in a public place. The citizen may decline to listen to the questions at all and may go on his way. *People v Shabaz,* 424 Mich 42, 56-57; 378 NW2d 451 (1985), cert gtd 475 US 1094 (1986), dismissed as moot 478 US 1017 (1986).

The second ground requires a consideration of whether the stop was lawful under the "stop and frisk" doctrine of *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968). Under *Terry,* investigative stops are lawful if the law enforcement officers have a reasonable, articulable suspicion that a person has committed or is about to commit a crime. *Shabaz, supra,* p 57; *Payton, supra,* pp 430-431. "Investigative pursuits" or "chases" have also been upheld as lawful police conduct without any requirement of a reasonable, articulable suspicion of criminal activity so long as the police conduct was not "so intimidating" that the person could have reasonably believed that he was not

free to disregard the police presence and go about his business. *Michigan v Chesternut,* 486 US —; 108 S Ct 1975, 1981; 100 L Ed 2d 565, 573 (1988). Whether or not the police conduct violates the Fourth Amendment and amounts to an unlawful seizure continues to be evaluated on the basis of a consideration of all the circumstances surrounding the incident in each case. *Id.,* 108 S Ct 1979; 100 L Ed 2d 571.

Here, there was evidence of flight after the deputies made a U-turn with the objective of stopping the defendant to seek his assistance in their investigation of a recent crime. They had no suspicion that defendant was involved in that crime and there is no evidence that defendant drove unlawfully or failed to respond to any signal to stop. At best, Deputy Kowalkowski was able to articulate his suspicions as follows:

> *A.* We turned around. He had gone past us to the south. We turned around and we were in the process of catching up to the van. We were accelerating quite rapidly and we were not catching up to the van. He was still in Manistee County, that stretch of road is. I would have to get a map out but I would guess we were a mile and a half from the county line or two miles at that point because we were north of the Nine Mile Bridge then.
>
> *Q.* What did this van do as you attempted to catch up to it.
>
> *A.* Well, it accelerated. I was driving the car and I was trying to catch up and I saw I wasn't catching up to him and I turned and asked Doug if he was—if he believed that the van was accelerating and he said yes.
>
> \* \* \*
>
> *Q.* Continue please.
>
> *A.* Well, Deputy Cermak believed the van was accelerating, too. He told me that. Madison Road ends at—well, it doesn't end at the county line but

where the Manistee County line ends or where I
believe it ends the county line road crosses that
intersection and goes east. The van we were pursu-
ing turned east onto the county line road. If it has
a name, I don't know what it is. That is a dirt road
that is unimproved and it has several big curves in
it. We turned the corner behind the van and
caught up to it about a quarter of a mile down the
road. We activated our overhead lights to get him
to stop a quarter of a mile to a half mile to get
him to stop and he pulled over, not immediately,
but he continued on down the road a little ways
and then he pulled over.

Although a factor, flight alone is not enough to
justify a *Terry* stop. *Payton, supra,* p 431. There
must be other circumstances that make the import
of the defendant's flight less ambiguous. *Shabaz,
supra,* p 62.

Here, it was certainly reasonable for the depu-
ties to be suspicious of defendant's flight from
their vehicle after they made the u-turn, even
though defendant drove lawfully and did not ex-
ceed the speed limit. However, this was not
enough to supply the deputies with articulable
grounds for concluding that criminal activity was
afoot. It is only this reasonable belief that criminal
activity is afoot that justifies a stop under *Terry.*
Having considered the totality of the circum-
stances surrounding the deputies' decision to sig-
nal defendant to stop, we conclude that the trial
court clearly erred in finding that the initial stop
of the defendant was lawful.

Our holding does not, however, require reversal
since the trial court correctly ruled to admit the
evidence and we will not reverse a trial court
when it reaches the correct result for the wrong
reason. *People v Perryman,* 89 Mich App 516, 520;
280 NW2d 579 (1979). When a defendant claims

that physical evidence should be suppressed as a result of an unlawful seizure of his person, the appropriate inquiry is whether that evidence was procured by an exploitation of the illegality or, instead, by means sufficiently distinguishable to be purged of the primary taint. See *People v Jones,* 66 Mich App 223, 230-231; 238 NW2d 813 (1975), modified on other grounds 397 Mich 871 (1976), citing *Wong Sun v United States,* 371 US 471, 488; 83 S Ct 407; 9 L Ed 2d 441 (1963). This is not a "but for" test, but rather depends on whether there has been an exploitation of the primary illegality. *Jones, supra,* p 231. As explained in *People v Roderick Walker,* 27 Mich App 609, 617; 183 NW2d 871 (1970):

> Various approaches have been taken by the courts in deciding whether in particular cases the people have taken advantage of or exploited the primary illegality. One test, suggested by some commentators and applied by some courts, and which makes sense to us, is whether it was reasonably foreseeable by the police when they acted that by engaging in the illegal behavior they might obtain evidence of the kind they obtained.

Here, the unlawful stop produced defendant and his vehicle. However, the physical evidence obtained resulted from the fact that one of the deputies immediately recognized defendant as being the subject of outstanding bench warrants. Defendant's lawful arrest and all the evidence obtained resulted from that identification. Under the circumstances of this case, it was not reasonably foreseeable for the deputies to believe that they would be able to recognize the driver of the vehicle as being the subject of outstanding bench warrants at the time they made the stop. There was no exploitation of the primary illegality and,

hence, the "fruit of the poisonous tree" doctrine was inapplicable. We conclude from the authorities cited above that where the police have unlawfully stopped or detained a citizen and then discover that the person detained is the proper subject of a lawful arrest on grounds other than the original illegal stop, the police may make the arrest and any evidence obtained as a result of the lawful arrest is admissible. For this reason, we uphold the trial court's ruling that the evidence was admissible.

Defendant also claims that the trial court erred in refusing to suppress the second and third statements made by defendant on the basis that defendant had not been properly read his *Miranda*[1] rights prior to his statements.[2] We disagree.

While defendant acknowledges that prior to the second and third statements he was generally advised of his various constitutional rights, defendant argues that the warnings given at the first interrogation (his second statement to police) were inadequate because he was not specifically advised that he could stop answering questions at any point, even midway through an interrogation. Defendant admits that he was specifically advised of this right at the second interrogation, conducted at the police station. In fact, the written statement given by defendant following that third questioning specifically informed him in writing of the right to refuse to answer any further questions.[3]

---

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[2] The trial court did suppress the initial statement made by defendant in the police cruiser prior to being read his *Miranda* rights. We offer no comment on whether it was necessary to suppress that statement.

[3] Defendant does argue that his third statement, made in response to the second interrogation, should also be suppressed on the theory that it resulted from his second statement, made in response to the

Defendant did not testify at either hearing held on his suppression motions, and, therefore, we can only determine what the officers advised defendant by their own testimony and the written exhibits introduced at those hearings. Deputy Cermak testified that he advised defendant of his *Miranda* rights by reading from a printed card that he carried for that purpose. At the hearing, Deputy Cermak summarized the card, but his summary did not include the warning that defendant may cease answering questions. An exhibit offered by the prosecution at the other suppression hearing included a copy of the sheriff department's *Miranda* warning card and that card included a warning to the suspect that he has "the right to decide at any time before or during questioning to use your right to remain silent and your right to talk with a lawyer while you are being questioned." We also note that the circumstances surrounding defendant's statement to the police indicate his statement was voluntary. His initial statement was a spontaneous uttering to the deputy, who then stopped defendant and advised him of his *Miranda* rights. Defendant then waived those rights and continued to make his statement to the deputy (the second statement). Thus, after being advised that he need not speak to the deputy, defendant chose to speak nevertheless. Furthermore, the second statement appears to have been relatively brief. According to the deputy's testimony, the extent of defendant's second statement was that he did wish to talk with the deputy, that "yeah, Doug, I took the stuff," acknowledged that the fruits of the crime were in his van, and an

---

first interrogation, at which he had been inadequately advised of his constitutional rights. Inasmuch as we conclude that defendant was adequately advised of his rights, we need not determine whether the third statement was tainted by any inadequate warning prior to the second statement.

agreement to allow the deputy to search the van. In light of the circumstances surrounding the statement, we agree with the trial court that defendant was adequately advised of his *Miranda* rights and that his statement to the police was voluntary. Accordingly, the trial court correctly denied the motion to suppress evidence of the statement.

For the reasons stated above, we conclude that defendant's arguments are without merit.

Affirmed.

K. I. MacDonald, J., concurred.

Sawyer, J. *(concurring)*. While I agree with the majority's conclusion, I disagree with the path they take in reaching that conclusion. Specifically, I believe the *Terry*[1] stop was proper.

This case presents an intriguing question concerning the authority of the police to stop a person in an automobile, not because they suspect the person of being involved in a crime, but in order to determine if that person has any information which may assist them in a criminal investigation. While this question is interesting, it is not necessary to resolve it in this case because I believe that, even if the police lacked that authority, the initial stop of defendant in the case at bar by the deputies was proper. Accordingly, I will assume, without deciding, that the police lack the authority to pull over a motor vehicle for the purpose of determining if the occupants of that vehicle have information relevant to a criminal investigation. Thus, under this assumption, the initial decision by the deputies to stop defendant's van to determine if the occupants of the van had information relative to the breaking and entering, such as

[1] *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

seeing another vehicle on the road, would be improper.

While, under this assumption, the deputies' initial decision to stop defendant's van was improper, thus normally leading to the conclusion that the seizure of the evidence was tainted, I believe that defendant's subsequent actions created a reasonable suspicion to permit the deputies to make a *Terry* stop. While the deputies may have had a constitutionally malignant motive in deciding to turn their vehicle around and follow defendant, their initial actions had not yet transgressed defendant's constitutional rights. That is, regardless of their motivation, the deputies were lawfully and constitutionally permitted to stop their cruiser and turn it around and begin to drive in the opposite direction on a public road. It is important to note that the deputies had not yet at this point turned on their overhead lights to signal defendant to stop. Before the officers took any action to direct defendant to stop his van, defendant accelerated away from the police vehicle and the deputies gave chase before activating their overhead lights, thus indicating to defendant to stop his vehicle.

The events leading up to the stopping of defendant's vehicle were described by Deputy Kowalkowski at the suppression hearing as follows:

*Q.* What did you do when you encountered this van?

*A.* Well, the van was going south on Madison Road as we were going north from the scene. I told Deputy Cermak that we hadn't seen anything so let's stop that van, see if the driver has seen any vehicles in the area.

*Q.* Were you in Manistee County at the time you first saw this van?

*A.* Yes, sir.

*Q.* Did you attempt to stop it?

*A.* We turned around. He had gone past us to
the south. We turned around and we were in the
process of catching up to the van. We were acceler-
ating quite rapidly and we were not catching up to
the van. He was still in Manistee County, that
stretch of road is. I would have to get a map out
but I would guess we were a mile and a half from
the county line or two miles at that point because
we were north of the Nine Mile Bridge then.

*Q.* What did this van do as you attempted to
catch up to it.

*A.* Well, it accelerated. I was driving the car and
I was trying to catch up and I saw I wasn't
catching up to him and I turned and asked Doug if
he was—if he believed that the van was accelerat-
ing and he said yes.

* * *

*Q.* Continue, please.

*A.* Well, Deputy Cermak believed the van was
accelerating, too. He told me that. Madison Road
ends at—well, it doesn't end at the county line but
where the Manistee County line ends or where I
believe it ends the county line road crosses that
intersection and goes east. The van we were pursu-
ing turned east onto the county line road. If it has
a name, I don't know what it is. That is a dirt road
that is unimproved and it has several big curves in
it. We turned the corner behind the van and
caught up to it about a quarter of a mile down the
road. We activated our overhead lights to get him
to stop a quarter of a mile to a half mile to get
him to stop and he pulled over, not immediately,
but he continued on down the road a little ways
and then he pulled over.

I believe that defendant's actions in attempting
to evade the deputies, for no apparent objective
reason, gave the deputies reasonable suspicion to
pull defendant over. That is, even if the deputies'
original decision to stop the van to determine if its
occupants had any information concerning the
crime was improper, defendant's subsequent eva-

sive actions prior to the deputies' being able to
effectuate the plan transformed what originally
might have been an illegal stop into a legal stop.
Simply put, defendant's actions created an inter-
vening probable cause (or reasonable suspicion) to
elevate the stopping of defendant to constitution-
ally permitted status.[2]

What remains to be analyzed, however, is the
question of the permissibility of a *Terry* stop based
solely upon defendant's evasive action after en-
countering a sheriff's cruiser. The leading case in
this area, upon which defendant places a great
deal of reliance, is *People v Shabaz,* 424 Mich 42;
378 NW2d 451 (1985), cert gtd 475 US 1094 (1986),
dismissed as moot 478 US 1017 (1986). In *Shabaz,
supra* at 62, the Michigan Supreme Court con-
cluded that the defendant's flight, by itself, in the
circumstances of that case, did not support reason-
able suspicion:

> Defendant's flight at the approach of police did
> not, by itself, in the circumstances of this case,
> support a reasonable suspicion. Although it is
> uncontroverted that flight may be a factor to be
> considered in ascertaining whether there is reason-
> able suspicion to warrant a *Terry* stop, *United
> States v Sharpe* [470 US 675; 105 S Ct 1568; 84 L
> Ed 2d 605 (1985)]; *United States v Brignoni-Ponce*
> [422 US 873; 95 S Ct 2574; 45 L Ed 2d 607 (1975)],
> flight alone is not a reliable indicator of guilt
> without other circumstances to make its import
> less ambiguous. *United States v Green* [216 US

---

[2] An analogous situation might be where an officer intends to go to
a house and enter without a warrant to conduct a patently illegal
search. However, upon arriving at the house, but before being able to
enter the house and violate the suspect's rights, the suspect appears
at the front door of the house, pulls a gun and fires at the officer. The
officer then chases the suspect back into the house where he manages
to effectuate an arrest. While the officer may have been in the initial
stages of a constitutionally repugnant action, the suspect's conduct
prior to the actual violation of his constitutional rights gave authority
for the officer's subsequent actions.

App DC 329, 333; 670 F2d 1148 (1981)]; *People v
Tebedo,* 81 Mich App 535; 265 NW2d 406 (1978).

The Supreme Court clearly stopped short of
concluding that flight cannot be the basis of rea-
sonable suspicion to warrant a *Terry* stop. Rather,
the totality of the circumstances must be consid-
ered. *Shabaz, supra* at 62. In *Shabaz,* two plain-
clothes undercover officers in an unmarked vehicle
in a high-crime area of Detroit observed the defen-
dant carrying a small brown paper bag while
walking along a public street. The unmarked po-
lice car began moving toward the defendant, at
which time he stuffed the bag under his clothes.
The car passed the defendant and then came to a
complete stop, at which point the defendant took
off running. The officers then apprehended defen-
dant and retrieved the bag, which contained a
revolver. The Supreme Court concluded that the
officers did not have any reasonable suspicion to
warrant a *Terry* stop.

Among the factors considered by the *Shabaz*
Court was the fact that the officers had not identi-
fied themselves to the defendant as police officers
and that the defendant's conduct was not necessar-
ily inculpatory in the light of the circumstances
under which it occurred. In essence, the Supreme
Court pointed out that, based upon the informa-
tion available to the officers, there could be a
reasonable explanation of the defendant's conduct
which was consistent with his innocence. That is,
the defendant behaved in the same manner that
one could reasonably expect an innocent citizen to
behave if he was carrying valuable property in the
brown paper bag in a high crime area and noticed
that he was being observed by two strange individ-
uals in an unmarked vehicle. The defendant in
*Shabaz* could have, for instance, been merely pro-

tecting himself from a potential mugging as far as the police were aware.

The case at bar is distinguishable from the situation in *Shabaz* in a number of important points. First, nothing in the record suggests that the area in which defendant was pulled over constitutes a high-crime area. Second, although it is not entirely clear from the record, it would appear that the deputies were on road patrol when they responded to the silent alarm and, therefore, it can be assumed that they were in a fully marked police cruiser when they pulled defendant over.[3] Third, defendant's van was the only vehicle in the area. Finally, the officers in *Shabaz* were not aware that any crime had been committed and were on patrol when the defendant aroused their suspicions; in the case at bar, the deputies were investigating a crime which had occurred in the area shortly before spotting defendant's van.

Thus, while it is conceivable that the defendant in *Shabaz* could have been a cautious citizen worried that he was about to be mugged by the two unidentified individuals he saw observing him, defendant in the case at bar had no such worries since he was not in a high-crime area and since his followers were identifiable as police officers. Similarly, defendant in the case at bar was traveling in a motor vehicle and, therefore, would be less vulnerable to a criminal attack than the defendant in *Shabaz,* who was on foot. Finally, I note that defendant began to run from the officers as soon as he sighted them. That is, from defendant's perspective, at the time he began to run there was no reason for him to believe that the officers were not

---

[3] This assumption is buttressed by the fact that the deputies turned on their overhead lights at one point during the chase to signal defendant to stop. I believe that it can be safely assumed that, had the deputies been in an unmarked vehicle, there would have been no overhead lights to turn on.

proceeding upon their ordinary business. The deputies had merely turned their car around and began to proceed down the road in the same direction as defendant and had not yet turned on their overhead lights to signal defendant to stop. As far as defendant would know, the deputies could have turned around because they had received a radio call to go to a location in the opposite direction, because it was nearing the end of their shift and they wished to proceed back to the sheriff's station or, for that matter, because they had decided to enjoy a morning cup of coffee and a donut at a restaurant in the opposite direction from which they had been traveling. Since the deputies had not made any significantly threatening conduct towards defendant, I believe the deputies could conclude that defendant began his flight out of a sense of guilt rather than a sense of innocence. Simply put, unlike the officers in *Shabaz,* I believe the deputies in the case at bar could reasonably become suspicious, in light of the surrounding circumstances, at defendant's conduct of attempting to flee from the deputies as soon as he noticed them following him.

For the above reasons, I conclude that the deputies in the case at bar had a reasonable suspicion that defendant was somehow involved in a criminal enterprise sufficient to warrant a *Terry* stop. Accordingly, defendant's theory that the deputies' subsequent search of his van, done with his permission, was tainted as the fruit of the poisonous tree, is without merit. Thus, the trial court correctly denied defendant's motion to suppress the evidence of the search.

With respect to defendant's other argument on appeal, concerning the admissibility of statements made to the police, I agree with the majority's analysis of that issue.

I, too, would affirm.