PEOPLE v. RODERICK WALKER

1. HOMICIDE — FIRST-DEGREE MURDER — INFERENCE — PREMEDITATION AND DELIBERATION.

Jury could infer that defendant had deliberated and premeditated the crime of first-degree murder where the evidence showed the defendant had told one witness that he had been in an argument with the decedent that night and had left him unconscious, defendant told another witness that he had killed the decedent, defendant needed money to pay back some money his girlfriend's mother thought he had taken, and the decedent was missing $500 when his body was found lying face down, with his hands bound behind him and his head bashed in by a tire iron (MCLA § 750.316).

2. HOMICIDE—FIRST-DEGREE MURDER—INSTRUCTIONS TO JURY.

Instruction to jury, that, if convinced beyond a reasonable doubt that defendant killed deceased as the result of cruelty or wickedness of the heart or recklessness of disposition, the crime would be murder in the first degree if done with deliberation and premeditation, was a correct statement of the law (MCLA § 750.316).

3. CONSTITUTIONAL LAW—WARNING OF RIGHTS—CUSTODIAL INTERROGATION—SEARCHES AND SEIZURES.

Warning of rights are required to be given before custodial interrogation, not as a condition precedent to the seizure of evidence.

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 40 Am Jur 2d, Homicide § 52.

[3, 4] 21 Am Jur 2d, Criminal §§ 309–317.

What constitutes "custodial interrogation" within rule of Miranda v Arizona requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.

[5–9] 29 Am Jur 2d, Evidence §§ 415, 531.

Modern status of law governing admissibility of evidence obtained by unlawful search and seizure. 50 ALR2d 531.

4. SEARCHES AND SEIZURES—ATTORNEY AND CLIENT.

An attorney need not be appointed for an accused person before evidence may be seized.

5. CONSTITUTIONAL LAW—CRIMINAL LAW—EVIDENCE—INADMISSIBLE —FRUIT OF THE POISONOUS TREE DOCTRINE.

Evidence obtained as a result of an unconstitutional infringement of an accused person's rights may be inadmissible at trial under the "fruit of the poisonous tree" doctrine.

6. CRIMINAL LAW—FRUIT OF THE POISONOUS TREE DOCTRINE.

The fruit of the poisonous tree doctrine seeks to discourage unlawful police practices by depriving the people of advantage flowing from the "primary illegality" but, in applying the doctrine in particular cases, the exclusionary rule has its limitations as a tool of judicial control and in some contexts the rule is ineffective as a deterrent.

7. EVIDENCE—PRIMARY ILLEGALITY—TAINT.

One test in deciding whether in particular cases the people have taken advantage of or exploited primary illegality in obtaining evidence is whether it was reasonably foreseeable by the police when they acted that by engaging in the illegal behavior they might obtain evidence of the kind they obtained.

8. CRIMINAL LAW—EVIDENCE—DISCOVERY—BLOODSTAINED CLOTHING —UNLAWFUL DETENTION—NOT REASONABLY FORESEEABLE.

The discovery in a police station that defendant was wearing bloodstained clothing was not a "fruit" of an unlawful detention requiring that the clothing be suppressed because it was not reasonably foreseeable by the police when they acted that they might obtain the evidence in question by engaging in the illegal behavior.

9. CRIMINAL LAW—EVIDENCE—BLOODSTAINS—DISCOVERY BY PASSIVE MEANS—SUFFICIENTLY DISTINGUISHABLE—PRIMARY TAINT—ILLEGAL DETENTION.

Bloodstains observed by the police on the defendant's clothing while still on his person were found by passive means which makes the means of discovery "sufficiently distinguishable" so as to be purged of the primary taint of an illegal detention.

Appeal from Recorder's Court of Detroit, Henry L. Heading, J. Submitted Division 1 May 13, 1970, at Detroit. (Docket No. 7,906.) Decided October 30, 1970.

Roderick Dean Walker was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Angelo A. Pentolino,* Assistant Prosecuting Attorney, for the people.

*Raymond L. Miller,* for defendant on appeal.

Before: R. B. BURNS, P. J., and LEVIN and CHURCHILL,* JJ.

LEVIN, J. The defendant, Roderick Dean Walker, was convicted by jury verdict of first-degree murder.[1] He contends that (1) incriminating clothing he was wearing while he was being interrogated at Detroit police headquarters was improperly seized and, therefore, should not have been admitted into evidence, and (2) there was insufficient evidence to show the deliberation and premeditation required to increase the degree of the offense from second-degree murder to first-degree murder, and (3) there was instructional error. We affirm.

Walker was employed at a gas station managed by the victim, Joseph Risek. Shortly before Risek was killed he discharged Walker—Walker thought unjustifiably. On the evening the crime was committed Risek and Walker met at the gas station and an argument ensued. Later, when Risek left the station, they seemed to have patched up their differences and Walker drove off with Risek in Risek's automobile.

---

* Circuit judge, sitting on the Court of Appeals by assignment.
[1] MCLA § 750.316 (Stat Ann 1954 Rev § 28.548).

Risek and Walker left the station shortly after 9 p.m. Risek's body was discovered in his automobile at approximately 4 a.m. the following morning. Between 11 and 12 p.m., *i.e.,* less than three hours after Risek and Walker left the station, passersby noticed the automobile at the location where it was later found containing Risek's body.

Walker testified that Risek dropped him off a few blocks from the gas station and that he then proceeded to his girlfriend's home and stayed there until about 11:15 p.m. when he left to go back to work at the gas station.

A witness testified that Walker said that he had been in an argument with Risek that night and had left him unconscious. Another witness testified that at 11:30 p.m. that night Walker said he had killed Risek.

Walker needed money to pay back some money his girlfriend's mother thought he had taken. Risek had over $500 with him when he left for the gas station that evening. When his body was found the money was gone. His body was lying face down with his hands bound behind him; his head had been bashed in, and a tire iron, which appeared to have traces of blood on it, was near the body.

It is apparent that there was ample evidence from which the jury could infer that Risek's murderer had deliberated and premeditated the crime.

It is claimed that the following portion of the judge's charge to the jury is defective because the reference to deliberation and premeditation was an afterthought and deemphasized:

"I charge you that if you are convinced beyond a reasonable doubt that Roderick Dean Walker killed Joe Risek as the result of cruelty or wickedness of the heart or recklessness of disposition, that the

crime would be murder and that would be murder in the first degree, *that is, if it was done with deliberation and premeditation.* If it was done without deliberation and premeditation but with malice, it would be murder of the second degree". (Emphasis supplied.)

The instruction was a correct statement of the law. Elsewhere in his charge the judge repeatedly emphasized the distinction between second-degree murder and first-degree murder and elaborated on the additional fact findings required to convict the defendant of the more aggravated offense. At the conclusion of the charge the judge gave both the people's and Walker's lawyers an opportunity to voice objections to the charge. None were expressed by Walker's lawyer. There was no instructional error.

Walker was at the gas station when investigating police officers drove in at 7 a.m. shortly after Risek's body was discovered. The police were aware that Walker was one of the persons with Risek when he was last seen alive. Walker was asked to account for his whereabouts during the hours the crime was committed. After he responded, the officers asked him and another person at the station to accompany them downtown to Detroit police headquarters for questioning. Within an hour of Walker's arrival at police headquarters an officer noticed what appeared to him to be blood on Walker's shoes. Walker was then placed under arrest for murder, the *Miranda*[2] warnings were given and the shoes and other clothing were taken. Upon scientific analysis the shoes and some of the other clothing were shown to be stained with human blood.

---

[2] *Miranda* v. *Arizona* (1966), 384 US 436 (86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974).

Walker's trial attorney objected to the admission of the clothing. A hearing was then conducted out of the jury's presence to determine whether Walker was actually arrested before his formal arrest, when the blood stains were spotted, and whether the police had probable cause to arrest him before the blood was seen. The judge did not rule when the arrest occurred or if there was probable cause to arrest before the formal arrest. He ruled that the clothing was admissible, but that he would not allow any questioning of the officers regarding any statements Walker may have made to them.

The defendant's trial and appellate lawyers contend that the clothing· was inadmissible because it was taken from the defendant without benefit of counsel and because he was not given the *Miranda* warnings. The record shows, however, that Walker conceded that the *Miranda* warnings were given before the clothing was taken. More importantly and more to the point, the *Miranda* warnings are required to be given before custodial *interrogation*, not as a condition precedent to the seizure of evidence.[3] An attorney need not be appointed for an accused person before evidence may be seized.

A more difficult question is whether the discovery in the police station that Walker was wearing blood-stained clothing was a "fruit" of an unlawful detention requiring that the clothing evidence be suppressed.

Under the "fruit of the poisonous tree" doctrine evidence obtained as a result of an unconstitutional infringement of an accused person's rights may be inadmissible at trial. In *Silverthorne Lumber Co*

---

[3] The police do not rely on a consent to search and, therefore, there is not presented the question whether a *Miranda*-type specific warning related to Fourth Amendment rights should be given a suspect in custody before he is asked for consent to conduct a search. See *People* v. *Smith* (1969), 19 Mich App 359, 369–372.

v. *United States* (1920), 251 US 385 (40 S Ct 182, 64 L Ed 319, 24 ALR 1426), governmental officials illegally seized corporate books and documents. A court order was obtained requiring that they be returned but before returning them the governmental officials made photocopies and on the basis of the copies sought to subpoena the originals for use at the trial. The United States Supreme Court ruled that this could not be done, but, in so holding, the Court declared that the inhibition on the use of derivative evidence would not apply if it could be proven that the government learned of the evidence (p 392) "from an independent source".

In *Nardone* v. *United States* (1939), 308 US 338 (60 S Ct 266, 84 L Ed 307), the Court declared that while (p 341) "Sophisticated argument may prove a causal connection between [the primary illegality] and the Government's proof. As a matter of good sense * * * such connection may have become so attenuated as to dissipate the taint".

And in *Wong Sun* v. *United States* (1963), 371 US 471 (83 S Ct 407, 9 L Ed 2d 441), the Court declared that in deciding whether the causal connection between the primary illegality and the challenged evidence had become "so attenuated as to dissipate the taint" it was not enough that the evidence (p 488) "would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint' ".

Through these formulations the United States Supreme Court has cautioned against exclusion of all evidence traceable to illegal police activity, a warn-

ing which has not gone unheeded in the lower courts. The tendency of adjudication is to administer the fruits rule with great caution lest the effort to control police behavior free too many guilty persons.

We address ourselves to the question posed by the United States Supreme Court of whether the officers discovered the incriminating clothing at the police station by "exploiting" an unlawful detention or by "sufficiently distinguishable" means. Our conclusion that the means were "sufficiently distinguishable", that there was no "exploitation", makes it unnecessary for us to decide whether Walker's presence at the police station was an unlawful detention.[4]

The fruit of the poisonous tree doctrine seeks to discourage unlawful police practices by depriving the people of advantage flowing from the "primary illegality". In applying the doctrine in particular cases, we are mindful that the exclusionary rule has its limitations as a tool of judicial control and that in some contexts "the rule is ineffective as a deterrent. * * * Proper adjudication of cases in which the exclusionary rule is invoked demands a constant awareness of these limitations. * * * [A] rigid and unthinking application of the exclusionary rule, in futile protest against practices which it can never be used effectively to control, may exact a high toll

---

[4] The protection of the Fourth Amendment against unreasonable searches and seizures applies to the investigatory as well as the accusatory stage. *Davis* v. *Mississippi* (1969), 394 US 721 (89 S Ct 1394, 22 L Ed 2d 676).

There is a substantial question whether the police request that Walker accompany them to headquarters was precatory or would be understood by a reasonable man, as Walker claimed he understood it, to be a polite order. Or, to state the inquiry as one court has: whether the suspect is "physically deprived of his freedom of action in any significant way or is led to believe, as a reasonable person, that he is so deprived." *People* v. *Arnold* (1967), 66 Cal 2d 438, 448 (58 Cal Rptr 115, 121, 426 P2d 515, 521); *cf. Henry* v. *United States* (1959), 361 US 98, 103 (80 S Ct 168, 4 L Ed 2d 134).

in human injury and frustration of efforts to prevent crime".[5]

Various approaches have been taken by the courts in deciding whether in particular cases the people have taken advantage of or exploited the primary illegality. One test, suggested by some commentators[6] and applied by some courts,[7] and which makes sense to us, is whether it was reasonably foreseeable by the police when they acted that by engaging in the illegal behavior they might obtain evidence of the kind they obtained. Physical evidence is the reasonably foreseeable product of a search; responsive statements are the reasonably foreseeable product of interrogation.

If one starts with the premises that all evidence derived illegally will not necessarily be suppressed and that the purpose of the exclusionary rule is to discourage unlawful police practices, then it clearly is important to consider as a factor whether suppression of the derivative evidence in the case at hand is likely to deter repetition of the illegal behavior.[8] In our opinion, a police officer, aware of the illegality and, nevertheless, willing to engage in the illegal practice, will not be deterred by the suppression of evidence that he could not have anticipated obtaining when he indulged in the prohibited practice.

Measuring by that foreseeability standard, we think the trial judge correctly refused to suppress

---

[5] *Terry* v. *Ohio* (1968), 392 US 1, 13, 14, 15 (88 S Ct 1868, 20 L Ed 2d 889).

[6] Note, Fruit of the Poisonous Tree—A Plea for Relevant Criteria, 115 U of Pa L Rev 1136, 1148 (1967); Pitler, "The Fruit of the Poisonous Tree" Revisited and Shepardized, 56 Cal L Rev 579, 588, 597, 598 (1968).

[7] *LeBlanc* v. *United States* (CA 1, 1968), 391 F2d 916; *cf. United States* v. *Perdiz* (SDNY, 1966), 256 F Supp 805.

[8] Pitler, "The Fruit of the Poisonous Tree" Revisited and Shepardized, 56 Cal L Rev 579, 588, 589 (1968); Note, Fruit of the Poisonous Tree—A Plea for Relevant Criteria, 115 U of Pa L Rev 1136, 1147 (1967).

the bloodstained clothing.  The discovery of the incriminating bloodstains could not have been reasonably anticipated.  When Walker was asked by the police to accompany them downtown they had already viewed him and presumably had not spotted the bloodstains although it was already daylight. Both their declared and apparent purpose in asking Walker to accompany them downtown was to question him, not to search for physical evidence, especially evidence in plain view on his person.  The police could not have anticipated that by taking Walker downtown they might discover evidence already in their line of vision.

If Walker had been required to remove any clothing, an entirely different question would be presented.[9]  It would be difficult to distinguish the discovery of evidence following removal of clothing from the acquisition of evidence through interrogation,[10] fingerprinting[11] or as a result of a lineup identification,[12] in which kinds of cases evidence has been excluded where it was derived from an illegal detention or other prohibited action.  But in all those

[9] See *People* v. *Gardner* (1968), 266 Cal App 2d 19 (71 Cal Rptr 568); *Dujay* v. *State* (Tex Crim, 1963), 368 SW2d 613.  In these cases the police discovered, during a period of illegal detention, needle marks and scar tissue on the defendants' arms indicating narcotic addiction.  Although the opinions in the cases do not so state, it would appear that the marks were not plainly visible on the street and that they were covered by clothing which was not removed until after the defendants' detention.  In both cases the courts held that the observation of the needle marks was "fruit" of an illegal arrest and the evidence was suppressed.  See, also, *Nueslein* v. *District of Columbia* (1940), 73 App DC 85 (115 F2d 690).

[10] *Wong Sun* v. *United States* (1963), 371 US 471, 485 (83 S Ct 407, 9 L Ed 2d 441); *People* v. *Johnson* (1969), 70 Cal 2d 541 (75 Cal Rptr 401, 450 P2d 865) (confessions obtained after confrontation with illegally seized evidence; subsequent confession and codefendant's confession also excluded because traceable to first confession); *cf. Harrison* v. *United States* (1968), 392 US 219 (88 S Ct 2008, 20 L Ed 2d 1047).

[11] *Bynum* v. *United States* (1958), 104 App DC 368 (262 F2d 465); *Davis* v. *Mississippi* (1969), 394 US 721 (89 S Ct 1394, 22 L Ed 2d 676).

[12] *Gatlin* v. *United States* (1963), 117 App DC 123 (326 F2d 666).

cases not only was it reasonably foreseeable that the illegal activity might result in the acquisition of evidence, through the means of interrogation, fingerprinting or lineup identification, but it was also necessary for the police to take affirmative action to exploit the primary illegality; to question, to fingerprint, to place the accused person in a lineup or to require the removal of clothing. The affirmative means employed in those cases to obtain the evidence which was suppressed can be differentiated from the passive means—observation of the defendant's clothing while still on his person—by which the evidence here sought to be suppressed was obtained. The means here are "sufficiently distinguishable" to be purged of the primary taint.

Affirmed.

All concurred.