PEOPLE v LoCICERO (AFTER REMAND)

PEOPLE v MUELLER

Docket Nos. 104174, 104545. Argued October 9, 1996 (Calendar No. 10). Decided December 27, 1996.

Todd S. LoCicero and Robert C. Mueller were charged in the 46th District Court with possession with intent to deliver less than fifty grams of cocaine, possession with intent to deliver marijuana, and possession of open intoxicants in a vehicle. The court, Bryan H. Levy, J., dismissed the charges, finding that the officers did not have reasonable suspicion to stop the vehicle, and that the drugs seized should be suppressed. The Oakland Circuit Court, Gene Schnelz, J., affirmed. The Supreme Court remanded the case to the Court of Appeals. 442 Mich 925 (1993). On remand, the Court of Appeals, Hood, P.J., and Sawyer and E. J. Grant, JJ., reversed in an unpublished opinion per curiam, concluding that the stop was legal, and that the evidence was admissible without regard to the legality of the stop (Docket No. 166500). The defendants appeal.

In a unanimous opinion by Justice Levin, the Supreme Court held:

The officers did not have a reasonable suspicion to justify an investigative stop, and thus the evidence obtained must be suppressed.

1. The Fourth Amendment protects against unreasonable searches and seizures. The discovery of contraband does not validate an illegal search and seizure. While the brief detention of a person following an investigatory stop is considered a reasonable seizure if the officer has a reasonably articulable suspicion that the person is engaging in criminal activity, the reasonableness of that suspicion is to be determined case by case on the basis of the totality of all the facts and circumstances. Due weight must be given, not to the officer's inchoate and unparticularized suspicion or hunch, but to the specific reasonable inferences that may be drawn in light of experience. In this case, there was no articulation of how the defendants' conduct translated into potential criminal behavior other than a bald assertion by an officer that the situation looked like a drug transaction might be occurring. The officer's observations of the defendants' behavior did not give rise to the level of

reasonable suspicion, nor did he articulate reasons necessary, to justify an investigative stop. Consequently, the stop violated the Fourth Amendment.

2. The exclusionary rule forbids the use of direct and indirect evidence acquired from governmental misconduct, such as evidence from an illegal police search. In this case, the police stopped the defendants' vehicle because they suspected the defendants had, and that they could find, drugs. That the controlled substance discovered was alcohol, and not a narcotic, is not significant. The discovery of the alcohol was the direct result of active, not passive, police exploitation of the initial stop. The marijuana and crack cocaine subsequently discovered were properly suppressed as tainted evidence of the improper arrest because the discovery occurred only after the improper arrest.

Reversed and remanded.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *Richard Thompson*, Prosecuting Attorney, *Joyce F. Todd*, Chief, Appellate Division, and *John S. Pallas*, Assistant Prosecuting Attorney, for the people.

*Bellanca, Beattie & Delisle, P.C.* (by *Frank D. Eaman* and *Thomas R. Everett*), for the defendant.

Amicus Curiae:

*Michael Thomas*, President, *John D. O'Hair*, Prosecuting Attorney, and *Timothy A. Baughman*, Chief, Research, Training and Appeals, for Prosecuting Attorneys Association of Michigan.

AFTER REMAND

LEVIN, J. The question presented is whether the officers had reasonable suspicion under *Terry*[1] to stop the defendants. We agree with the district and circuit court judges that they did not, and that the evi-

---

[1] *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

dence obtained must be suppressed. We reverse the judgment of the Court of Appeals, which found that the stop and seizure were justified.

I

Defendants, Todd Stephen LoCicero and Robert Cook Mueller, were charged with possession with intent to deliver less than fifty grams of cocaine,[2] possession with intent to deliver marijuana,[3] and possession of open intoxicants in a vehicle.[4]

The district court judge dismissed the charges, finding that the officers did not have reasonable suspicion to stop the vehicle in which they were riding, and that the drugs seized should be suppressed as fruit of the poisonous tree. The circuit court affirmed.

This Court remanded to the Court of Appeals for consideration as on leave granted. The Court of Appeals reversed, concluding that the stop was legal, and that the evidence was admissible without regard to the legality of the stop. We reverse.

II

· On Friday, November 15, 1991, at approximately 10:40 P.M., undercover police officers, in unmarked vehicles, observed a Trans Am automobile occupied by Mueller and LoCicero driving in the parking lot of a Holiday Inn in Southfield. The Trans Am "looped" the half-full parking lot and drove toward a Ford vehicle in the back lot of the hotel. The two vehicles met for a moment, and then drove off from the parking lot

---

[2] MCL 333.7401(2)(a)(iv); MSA 14.15(7401)(2)(a)(iv).

[3] MCL 333.7401(2)(c); MSA 14.15(7401)(2)(c).

[4] MCL 436.34a; MSA 18.1005(1). This statute has been repealed and superseded by MCL 257.624a; MSA 9.2324(1).

onto Telegraph Road, proceeding southbound in the outside lane of southbound Telegraph Road with the Ford "in the lead."

The vehicles turned into the parking lot of the Tel-Ex Plaza[5] on Telegraph Road, just north of Ten Mile Road, less than a mile from the Holiday Inn. The vehicles proceeded toward the northeastern part of the lot to an unlit area by the theater marquee. The drivers of the two vehicles parked in available spaces, separated by three unoccupied parked vehicles, one row west of Telegraph.

The Trans Am passenger, Mueller, got out of the car and entered the passenger side of the Ford. The driver of the Ford remained in the vehicle with the lights turned off and the engine running. The driver of the Trans Am, LoCicero, walked about thirty or forty yards from the Trans Am in a westerly direction and looked around for less than a minute. He then walked back to the Trans Am and continued to look around as he waited at the driver's side.

Mueller and the driver of the Ford conversed for two or three minutes. The officer did not see the two exchange anything. Then the lights on the Ford were turned on, and Mueller was driven to the Trans Am. He entered the passenger side of the Trans Am, and the two vehicles left the lot and proceeded toward Telegraph Road.

As a result of these observations, an officer ordered a marked unit to stop the Trans Am, believing that the conduct of LoCicero and Mueller suggested a possible drug transaction. The Trans Am was stopped five

---

[5] The Tel-Ex Plaza includes a movie theater, a grocery store, and other businesses.

miles away on eastbound I-696 near Greenfield Road by a number of police cars.

An officer observed, on the floor of the Trans Am behind the driver's seat, what he thought to be a large knife, but what actually was a corkscrew with a small knife. LoCicero was instructed to go to an area where other officers were standing. The officer addressed Mueller, seated in the passenger seat, and observed that he had a glass of liquid between his legs. Mueller said it was vodka. Mueller was asked to step out of the vehicle, and both he and LoCicero were arrested.

Baggies containing marijuana were discovered under the passenger seat. Narcotics were not discovered in a pat-down search. After LoCicero and Mueller left the scout car that transported them to the station, a baggie was found containing a substance later determined to be crack cocaine.

### III

LoCicero and Mueller contend that the Court of Appeals erred in concluding that the officers were justified in conducting the investigatory stop. The prosecutor counters that the stop was made on the basis of a reasonable suspicion that the defendants were engaged or about to be engaged in criminal activity.

A judge's findings of fact following a suppression hearing will not be disturbed by this Court unless the findings are clearly erroneous.[6] The application of the constitutional standard to essentially uncontested

---

[6] *People v Burrell*, 417 Mich 439, 448; 339 NW2d 403 (1983).

facts, as in the instant case, is not, however, entitled to the same deference as factual findings.[7]

The Fourth Amendment of the United States Constitution protects against unreasonable searches and seizures.[8] The discovery of contraband does not validate an illegal search and seizure. A "search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success."[9]

The brief detention of a person following an investigatory stop is considered a reasonable seizure if the officer has a "reasonably articulable suspicion" that the person is engaging in criminal activity.[10] The reasonableness of an officer's suspicion is determined case by case on the basis of the totality of all the

---

[7] *People v Nelson*, 443 Mich 626, 631, n 7; 505 NW2d 266 (1993).

[8] The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .

Michigan's Constitution contains an analogous provision that states:

The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation. The provisions of this section shall not be construed to bar from evidence in any criminal proceeding any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house in this state. [Const 1963, art 1, § 11.]

Because the Michigan Constitution does not provide more protection than the federal constitution, defendants' claim implicates his federal constitutional rights. *People v Faucett*, 442 Mich 153, 158; 499 NW2d 764 (1993).

[9] *United States v DiRe*, 332 US 581, 595; 68 S Ct 222; 92 L Ed 210 (1948).

[10] *Terry*, n 1 *supra*; *Nelson*, n 7 *supra*.

facts and circumstances.[11] "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."[12]

Although this Court has indicated that fewer facts are needed to establish reasonable suspicion when a person is in a moving vehicle than in a house,[13] some minimum threshold of reasonable suspicion must be established to justify an investigatory stop whether a person is in a vehicle or on the street.

In *Sibron v New York*, 392 US 40; 88 S Ct 1889; 20 L Ed 2d 917 (1968), the United States Supreme Court held that the police did not have reasonable suspicion to stop a man when they had watched him interact for over eight hours with known drug addicts.

In *People v Freeman*, 413 Mich 492; 320 NW2d 878 (1982), this Court held that the police did not have reasonable suspicion to stop a man at 12:30 A.M. in a vehicle, that was idling with its parking lights on, in a darkened, deserted parking lot near a darkened house.

---

[11] *United States v Cortez*, 449 US 411; 101 S Ct 690; 66 L Ed 2d 621 (1981); *People v Jordan*, 187 Mich App 582, 586; 468 NW2d 294 (1991).

[12] *Terry*, n 1 *supra* at 27. This Court recently summarized the law in *People v Champion*, 452 Mich 92, 98; 549 NW2d 849 (1996):

Police officers may make a valid investigatory stop if they possess "reasonable suspicion" that crime is afoot. *Terry v Ohio, supra*. Reasonable suspicion entails something more than an inchoate or unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause. *United States v Sokolow*, 490 US 1; 109 S Ct 1581; 104 L Ed 2d 1 (1989).

[13] *People v Whalen*, 390 Mich 672, 682; 213 NW2d 116 (1973).

In *People v Nelson*, 443 Mich 626; 505 NW2d 266 (1993), this Court found that the police were justified in stopping the three defendants as they left a known drug house after a brief visit. The three defendants drove up to the house, and remained for only four minutes. The house was a known drug house that had been under surveillance for two weeks. Information from a reliable informant indicated that the house was still being operated as a drug house, and that the supply of drugs had diminished and was about to be replenished. At the time of the stop, other officers were in the process of obtaining a search warrant for the house.

This Court observed that the detective watching the house testified "that on the basis of his twenty-three years experience, the defendants' behavior was characteristic of a 'crack-house' buy: 'a short visit, in/out, back in the car and down the road.' It was described as a 'carbon copy' of what had occurred two weeks earlier."[14] The Court concluded that this knowledge, coupled with the other information the police had regarding the house, formed the basis for reasonable suspicion justifying further inquiry.

In *People v Champion*, 452 Mich 92, 99; 549 NW2d 849 (1996), we adopted the Court of Appeals "ruling that an investigative stop and pat down search for

---

[14] *Id.* at 629. See also *People v Bordeau*, 206 Mich App 89, 93; 520 NW2d 374 (1994), where the Court of Appeals concluded:

> The suspicion which led Sergeant Collins to stop defendant's vehicle was reasonable in the context of the circumstances and the sergeant's experience of twenty-two years. It was particular in that the vehicle was coming from the area of the reported crime, in the direction reported by the witness, and was the only vehicle on the road in that area.

weapons was reasonable under the totality of the circumstances."

> Particularized suspicion arose as a result of the following factors: (1) the area was a known drug crime area, (2) a man, seeing a marked police car, ran from sight around a corner, (3) as officers turned the corner, two men got out of a car parked midblock, (4) the passenger and the man at the corner ran away, (5) the driver made some movement away from the car, (6) he was known by the police to have previous drug and weapons convictions, (7) he held his hands inside the front of his sweatpants, and (8) he refused several police orders to remove his hands from his sweatpants. [*Id.* at 99-100.]

In *People v Yeoman*, 218 Mich App 406; 554 NW2d 577 (1996), an officer observed a man using the change machine at a car wash after midnight. When the officer drove into the parking lot, the man entered a vehicle driven by defendant Yeoman and left abruptly, leaving several dollars' worth of quarters in the change tray of the money changer. The defendant's car returned a few moments later, as if to check if the officer had left. The officer stopped the vehicle for further investigation, and then learned from another officer that the car wash owner had complained of theft from the changers.[15]

The Court of Appeals found that the totality of the circumstances, including the time of night, the appearance that the money changer had not been used for the purchase of car wash services, the hurried retreat from the area when the officer arrived, the abandonment of quarters in the change tray, the subsequent drive past the car wash, and the officer's

---

[15] A search of the defendants' vehicle disclosed articles known to be used to defraud money changer machines.

involvement the previous night in the arrest of other individuals suspected of defrauding vending machines in a similar manner was sufficient to form a reasonable suspicion.

In the instant case, the officer stated the following as his reasons for authorizing the marked cars to stop LoCicero and Mueller:

> Upon the basis of the meeting at the Holiday Inn, the together—excuse me, together driving to the Tel-[Ex] Plaza, both vehicles parking separate, the drivers, one passenger getting out, the driver getting out and moving, I believe that there was . . . a possible drug transaction occurring.

Additional facts noted by the officer during the course of the preliminary examination include the Trans Am looping the hotel parking lot, the parked Ford with its engine running,[16] but its lights turned off, the short period during which the two cars met before proceeding from the Holiday Inn parking lot to Telegraph Road, and the nature and character of the Tel-Ex parking lot and the marquee where the two cars parked.

LoCicero and Mueller's conduct might have given rise to a hunch that they were engaged in criminal activity, but a hunch is not sufficient to give rise to reasonable suspicion. A hunch might provide a reason to observe the persons under surveillance further, or to run the license plates of their vehicles. An officer testifying that he inferred on the basis of his experience and training is obliged to articulate how the behavior that he observed suggested, in light of his

---

[16] At 10:40 P.M. on a mid-November night.

experience and training, an inference of criminal activity.

In *Nelson, Champion,* and *Yeoman* the officers explained how the inferences they drew from their observations were based on their training and experience in similar circumstances and with similarly situated defendants generally, or with respect to their experience with the particular defendants in those cases.

In this case, however, there was no articulation of how LoCicero and Mueller's conduct translated into potential criminal behavior other than the bald assertion by an officer that the situation looked like a drug transaction may be occurring.

The officers had no prior experience with LoCicero and Mueller. It is not contended that the Tel-Ex Plaza is a high crime area or a known scene of drug activity, as in *Champion*. LoCicero and Mueller did not act evasively or engage in furtive gestures upon encountering the police, as in *Champion* and *Yeoman*.[17]

The officer did not testify that he or another officer had observed persons looping the back lot of the Holiday Inn on another occasion, or that such back lot meetings were a carbon copy of drug activity, as in *Nelson*. There was no extended surveillance of the area or these defendants, as in *Terry*. There was no tip concerning the defendant's activity, as in *Nelson* and *People v Bordeau,* 206 Mich App 89; 520 NW2d 374 (1994). There was no testimony explaining the reason or type of undercover surveillance engaged in by the officers who first observed the Trans Am loop-

---

[17] LoCicero and Mueller were unarmed.

ing the Holiday Inn parking lot, as in *Nelson* and *Yeoman*.[18]

The officer followed the two vehicles from the hotel to the parking lot of a movie theater and other stores where the two vehicles parked by the theater marquee, located off of Telegraph Road. The vehicles parked in the same row, but were separated by intervening parked vehicles. On this record, we do not find that an objective level of suspicion attaches to the defendants driving into a parking lot of an open business at a reasonable hour of the evening.

We acknowledge that the officer said that the activities he witnessed looked like a drug transaction.[19] He merely restated, however, each of the facts that he found suspicious and drew a general conclusion. He did not explain how his previous training and experience led to this conclusion.

We conclude that the officer's observations of defendants' behavior did not give rise to the level of reasonable suspicion, nor did he articulate reasons

---

[18] We acknowledge that the police are not obliged to negative an innocent explanation. This Court observed in *Nelson*:

> [T]he absence of apparent innocent behavior has never been a requirement for the suspicion required to make an investigatory stop. *United States v Sokolow*, 490 US 1, 9; 109 S Ct 1581; 104 L Ed 2d 1 (1989). The question is not whether the conduct is innocent or guilty. Very often what appears to be innocence is in fact guilt, and what is indeed entirely innocent may in some circumstances provide the basis for the suspicion required to make an investigatory stop. Thus, the focus is on the " 'degree of suspicion that attaches to particular types of noncriminal acts.' " *Id.* at 10. [*Nelson, supra* at 632.]

[19] A tip may be used in forming reasonable suspicion, *Alabama v White*, 496 US 325; 110 S Ct 2412; 110 L Ed 2d 301 (1990). In this case, although there was evidence of an alleged tip, no information gained from it was produced at the preliminary examination.

necessary, to justify an investigative stop. Consequently, the stop violated the Fourth Amendment.

IV

LoCicero and Mueller also contend that the Court of Appeals erred in holding that the evidence derived from the investigative stop was admissible even if the initial stop was improper. The Court of Appeals said:

> Because defendants could be arrested for transporting and possession of an open container of intoxicants in a vehicle, they were the proper subjects of a lawful arrest. It was not until after they were arrested for this that the drugs were discovered and seized. Therefore, even if we were to conclude that the officers' stop of defendants was improper, the evidence should not have been suppressed.

The exclusionary rule forbids the use of direct and indirect evidence acquired from governmental misconduct, such as evidence from an illegal police search.[20]

Three exceptions to the exclusionary rule have emerged: the independent source exception,[21] the attenuation exception,[22] and the inevitable discovery

---

[20] *Wong Sun v United States*, 371 US 471, 484; 83 S Ct 407; 9 L Ed 2d 441 (1963). Stratton, *The attenuation exception to the exclusionary rule: A study in attenuated principle and dissipated logic*, 75 J Crim L & Criminology 139 (1984).

[21] *Silverthorne Lumber Co v United States*, 251 US 385; 40 S Ct 182; 64 L Ed 319 (1920) (the government may use tainted evidence if it also discovered the evidence by legal, independent means).

[22] Courts and commentators credit the following passage in *Nardone v United States*, 308 US 338, 341; 60 S Ct 266; 84 L Ed 307 (1939), as establishing the attenuation exception. "Sophisticated argument may prove a causal connection between information obtained through illicit wiretapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint." *Id.* at 341. *Stratton*, n 20, *supra*, LaFave & Israel, Criminal Procedure (2d

exception.[23]

The Court of Appeals ruled the evidence admissible, relying on its holding in *People v Lambert*, 174 Mich App 610; 436 NW2d 699 (1989). *Lambert* relied on the attenuation exception discussed in *People v Walker*, 27 Mich App 609, 617; 183 NW2d 871 (1970).

In *Lambert*, an officer recognized the defendant as a person being sought on an outstanding arrest warrant during an improper police detention. The Court of Appeals found that, under the circumstances,

> it was not reasonably foreseeable for the deputies to believe that they would be able to recognize the driver of the vehicle as being the subject of outstanding bench warrants at the time they made the stop. There was no exploitation of the primary illegality and, hence, the "fruit of the poisonous tree" doctrine was inapplicable. [*Id.* at 617-618.]

In *Lambert*, the police did not discover evidence—they discovered the defendant.

In *Walker*, the police suspected the defendant's involvement in a murder. Without probable cause, they asked him to go downtown for questioning. The police did not find incriminating evidence on the defendant at that time. At the station, however, an officer noticed bloodstains on the defendant's shoes. *Id.* at 612-613.

---

ed), ch 9, § 9.3, pp 471-476. *Wong Sun* also discussed the attenuation exception. *Id.* at 485.

[23] *Nix v Williams*, 467 US 431; 104 S Ct 2501; 81 L Ed 2d 377 (1984) (suppression of tainted evidence is not required where the prosecution establishes that the evidence would have been discovered by lawful means, i.e., discovery was inevitable).

The Court of Appeals found both the "declared and apparent purpose [of the police] in asking Walker to accompany them downtown was to question him, *not to search for physical evidence*, especially evidence in plain view on his person. The police could not have anticipated that by taking Walker downtown they might discover evidence already in their line of vision." *Id.* at 618. (Emphasis added.) Further, the police did nothing to exploit the initial illegality, but rather obtained evidence by *passive* means. *Id.* at 619.

In this case, the police stopped the Trans Am because they suspected the defendants had, and they could find, drugs. The officer testified that he "believe[d] that there was a possible drug transaction occurring." That the "controlled substance" discovered was alcohol, and not a narcotic, is not significant. The discovery of the alcohol was the direct result of active, not passive, police exploitation of the initial stop. *Id.* The marijuana and crack cocaine subsequently discovered were properly suppressed as tainted evidence of the improper arrest because the discovery occurred only after the improper arrest.[24]

Reversed and remanded to the district court for further proceedings consistent with this opinion.

BRICKLEY, C.J., and CAVANAGH, BOYLE, RILEY, MALLETT, and WEAVER, JJ., concurred with LEVIN, J.

---

[24] *Rios v United States*, 364 US 253, 262; 80 S Ct 1431; 4 L Ed 2d 1688 (1960) (if the initial arrest of a defendant was unlawful "nothing that happened thereafter could make that arrest lawful or justify a search as its incident").