*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

UNPUBLISHED
March 28, 2024

v

DERRIUS LAMAR THURMOND,

      Defendant-Appellee.

No. 367617
Oakland Circuit Court
LC No. 22-280401-FH

Before: CAVANAGH, P.J., and JANSEN and MALDONADO, JJ.

PER CURIAM.

The prosecutor appeals by leave granted[1] the trial court's suppression of evidence obtained from defendant's person and vehicle, after an investigatory stop and arrest.[2] We reverse and remand.

## I. FACTUAL BACKGROUND

On November 14, 2021, defendant's girlfriend, Kayla Roy (Roy), called 911 to report a domestic incident involving defendant. At 11:12 a.m., officers were informed, through Computer Assisted Dispatch (CAD) communications and police radio transmissions, that a domestic incident occurred at an apartment. Initally, officers were only told that a verbal argument occurred, not a physical assault. At 11:15 a.m., dispatch informed officers that the 911 caller reported defendant dragged Roy to the door and told her to leave. At 11:16 a.m., dispatch told officers that defendant

---

[1] *People v Thurmond*, unpublished order of the Court of Appeals, entered November 9, 2023 (Docket No. 367617).

[2] Defendant is charged with three counts of human trafficking–forced labor resulting in injury/commercial sexual activity, MCL 750.462b(2); assault with intent to do great bodily harm less than murder or by strangulation, MCL 750.84; possession of a controlled substance or analog, MCL 333.7403(2)(b)(*ii*); two counts of receiving earnings from prostitution, MCL 750.457; transporting a person for prostitution, MCL 750.459; and operation of a motor vehicle with a suspended license, MCL 257.904(3)(a).

left the apartment, was likely driving a black Ford Taurus, and provided the license plate number of the vehicle. Officers were also made aware that the 911 caller was named Kayla, and was involved in the domestic dispute.

Officer Trigger (Trigger), of the Troy Police Department, responded to the apartment and spoke to Roy. Trigger informed other officers, through radio transmissions, that defendant likely went to the Hawthorn Suites to meet another female. Sergeant Sollars (Sollars) arrived at the Hawthorn Suites first, and found defendant in a black Taurus with the described license plate number, pulling out of the parking lot. Sollars stopped the vehicle. As Sollars made the stop, Officer Cooper (Cooper) and Officer Doll (Doll) arrived at the Hawthorn Suites, and pulled their patrol car in front of the Taurus. Defendant was driving the Taurus and Brittany Minnie (Minnie) and Jazimen Essex (Essex) were passengers.

Defendant told Sollars that he did not have a driver's license. Defendant also acknowledged that a domestic incident had occurred and showed Sollars a video recording on his phone of a female destroying property. Sollars obtained Law Enforcement Information Network (LEIN) information about defendant, confirming that defendant did not have a valid driver's license and had outstanding warrants.

After defendant was arrested, Doll searched defendant's person. Doll removed a pill bottle containing what was later identified as Adderall, and additional ground-up pills, later identified as Alprazolam. Doll also removed a Cash App card, in the name of Enrico Ybsincere, and found $3,191 in defendant's left front pocket. The vehicle was impounded because no one was available to drive it. During an inventory search of the vehicle, officers found methamphetamines in Essex's handbag, and Essex was placed under arrest. Officers also recovered bags containing laptops, phones, Essex's journals, and other personal items. The larger bags were removed from the vehicle at the Hawthorn Suites and were taken to the police station to inventory because of inclement weather. Defendant was charged with three counts of human trafficking–forced labor resulting in injury or commercial sexual activity, MCL 750.462b(2);[3] assault of Roy by strangulation, MCL 750.84; possession of the controlled substance amphetamine, MCL 333.7403(2)(b)(*ii*); two counts of receiving earnings from prostitution, MCL 750.457;[4] transporting Minnie for prostitution, MCL 750.459; and operation of a motor vehicle with a suspended license, MCL 257.904(3)(a).

Defendant moved to suppress all evidence obtained from the November 14, 2021 search and seizure. During an evidentiary hearing, Sollars testified that he did not have specific details of the domestic incident before he made it to the Hawthorn Suites. Sollars explained that the incident showed up on CAD as "domestic," which could be a domestic assault or a domestic dispute. According to Sollars, he was aware of the identity of the caller, and aware that the caller was "calling to report having been assaulted."[5]

---

[3] Defendant's human trafficking charges involve Roy, Minnie, and Essex.

[4] Defendant's charges for receiving earnings from prostitution involve Minnie and Essex.

[5] Sollars was asked: "And to your knowledge, the 911 caller, was it the person who was calling to report having been assaulted?" Sollars responded: "Correct."

Cooper testified that he could not recall if the dispatch provided specific details of the domestic incident, but he knew it was a domestic assault. He explained that a dispatch for "domestic" generally means an assault occurred, not a verbal argument. Cooper could not recall whether dispatch provided him with a description of a person, but did recall he was provided details of the vehicle and plate number. Cooper also testified that he was not aware of the identity of the 911 caller.

The trial court granted defendant's motion, as it related to evidence obtained from defendant's person and vehicle. The trial court limited its analysis to Sollars's testimony, and held that it was unclear whether domestic violence occurred or a verbal argument. The trial court also held that defendant had standing to challenge the admission of Essex's journals because the journals were found in the vehicle.

We granted leave to determine whether officers had reasonable suspicion to stop defendant and whether defendant had standing to challenge the admission of Essex's journals.

## II. STANDARD OF REVIEW

We review "a trial court's factual findings in a suppression hearing for clear error." *People v Jenkins*, 472 Mich 26, 31; 691 NW2d 759 (2005). "Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Johnson*, 466 Mich 491, 497-498; 647 NW2d 480 (2002). "[T]he application of constitutional standards regarding searches and seizures to essentially uncontested facts is entitled to less deference; for this reason, we review de novo the trial court's ultimate ruling on the motion to suppress." *People v Williams*, 472 Mich 308, 313; 696 NW2d 636 (2005). "Whether a party has standing is a question of law that is reviewed de novo." *People v Gadomski*, 274 Mich App 174, 178; 731 NW2d 466 (2007).

## III. ANALYSIS

## A. INVESTIGATORY STOP

"Both the United States and Michigan Constitutions guarantee protection against unreasonable searches and seizures. The Fourth Amendment search and seizure protections also apply to brief investigative detentions." *People v Steele*, 292 Mich App 308, 314; 806 NW2d 753 (2011) (citations omitted); see also US Const, Am IV and Const 1963, art 1, § 11. As this Court recognized in *Steele*, 292 Mich App at 314, "in *Terry v Ohio*, 392 US 1, 30-31; 88 S Ct 1868; 20 L Ed 2d 889 (1968), the United States Supreme Court held that the Fourth Amendment permits a police officer to make a brief investigative stop (a "*Terry* stop") and detain a person if the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Terry* stops may also be used to "briefly detain a person who is in a motor vehicle if the officer has a reasonable, articulable suspicion that the person is engaged in criminal activity." *Steele*, 292 Mich App at 314.

"Whether an officer has a reasonable suspicion to make such an investigatory stop is determined case by case, on the basis of an analysis of the totality of the facts and circumstances." *Jenkins*, 472 Mich at 32. "In determining reasonableness, the court must consider whether the facts known to the officer at the time of the stop would warrant an officer of reasonable precaution to suspect criminal activity." *Steele*, 292 Mich App at 314. "Although reasonable and articulable

suspicion is a lesser showing than probable cause, it still entails something more than an inchoate or unparticularized suspicion or hunch, because an officer must have had a particularized and objective basis for the suspicion of criminal activity." *People v Pagano*, 507 Mich 26, 32; 967 NW2d 590 (2021) (quotation marks and citation omitted).

"[F]actors that in isolation appear innocent may, in combination, provide a police officer with reasonable suspicion to justify an investigative stop[.]" *People v Oliver*, 464 Mich 184, 193; 627 NW2d 297 (2001). "[F]ewer facts are needed to establish reasonable suspicion when a person is in a moving vehicle than in a house," however "some minimum threshold of reasonable suspicion must be established to justify an investigatory stop whether a person is in a vehicle or on the street." *People v LoCicero*, 453 Mich 496, 502; 556 NW2d 498 (1996).

As an initial matter, the prosecution argues the trial court erred by only relying on the knowledge of Sollars, to determine whether a reasonable suspicion for the investigatory stop existed. We agree. Under the "collective knowledge" or "police team" approach, courts may consider the collective knowledge of officers involved in an investigation. *People v Nguyen*, 305 Mich App 740, 751, 754; 854 NW2d 223 (2014) (explaining the "police team" approach may be used to determine whether officers had probable cause to make an arrest); see also *People v Dixon*, 392 Mich 691, 698; 222 NW2d 749 (1974), abrogated on other grounds by *People v Hawkins*, 468 Mich 488; 668 NW2d 602 (2003).

Sollars, Cooper, and Doll all received dispatches, via radio transmissions and CAD, stating that a domestic incident occurred. Sollars arrived at the Hawthorn Suites first and initially stopped the Taurus. As Sollars stopped the vehicle, Cooper and Doll arrived and pulled in front of the Taurus. The trial court erred by ignoring Cooper's testimony and basing its decision solely on Sollars's recollected knowledge.

The CAD card and radio transmissions indicate that Sollars, Cooper, and Doll were informed at 11:12 a.m., both through radio and written communications, that a domestic incident was reported by a 911 caller who was involved in the incident. At 11:15 a.m., officers were informed the caller reported that defendant dragged her to the door. At 11:19 a.m., before officers arrived to the Hawthorn Suites, officers were informed, via radio, that the 911 caller's first name was Kayla. Sollars testified that he was aware of the identity of the 911 caller. Cooper testified that he was not aware of the identity of the 911 caller. Based on Sollars's testimony, CAD card data, and radio transmission evidence, officers were aware that the 911 caller was not an anonymous informant. Officers knew dispatch was being provided with a first-hand account of the incident.

Although the initial report did not indicate violence occurred, about three minutes later the dispatcher informed officers through written and verbal communications, the caller reported that defendant dragged her to the door. Sollars testified that the incident was reported as "domestic," but did not specify whether the domestic incident was a verbal or physical altercation. According to Sollars, he did not know specific details of the domestic incident while he was searching for defendant. Sollars did agree that he knew the 911 caller was "calling to report having been assaulted." Cooper testified he was aware that he was responding to a physical assault. Both CAD card and radio transmission evidence indicate all officers were informed, before the stop was effectuated, that Roy reported that defendant physically dragged her, indicating a physical assault

-4-

occurred. Under the collective knowledge approach, officers were collectively aware that a criminal domestic assault was reported.

Officers were provided with a description and license plate number of the vehicle defendant was driving. Officers were also provided a physical description of defendant, through CAD communications. Trigger, who responded to the apartment and spoke with Roy, informed officers that defendant was likely at the Hawthorn Suites, to meet a female. This information was proven to be credible because Sollars found a black Taurus, matching the provided license plate number, in the parking lot of the Hawthorn Suites. A man was driving the vehicle and two women were passengers.

Considering the totality of the circumstances, officers had a reasonable suspicion to believe criminal activity occurred. Officers were informed of a domestic assault, based on a 911 call made by Roy, the alleged victim. Roy provided specific details on the incident, defendant, the vehicle defendant was driving, and the location where defendant was likely to be found. It was reasonable for officers to believe defendant was involved in criminal activity. In other words, the officers had reasonable suspicion to stop defendant—who was driving the vehicle described by Roy at the location where she told officers that defendant was likely to go—to investigate the domestic violence allegations. Accordingly, the trial court erred in holding that officers lacked a reasonable suspicion to make the investigatory stop.[6]

## B. STANDING

Because we hold that the trial court erred by suppressing evidence obtained from defendant's person and the vehicle he was driving—including Essex's journals—based on lack of reasonable suspicion, we need not reach the issue of whether defendant had standing to challenge the admission of Essex's journals. In other words, the traffic stop was lawful and the events that followed—defendant's arrest after police learned that he was driving without a license and that he had outstanding warrants—supported the search incident to defendant's arrest and an inventory search of the vehicle when it was impounded. Therefore, it is unnecessary to address whether defendant had standing to raise a Fourth Amendment challenge to the search of the bags in the vehicle and the seizure of the journals in particular. The issue of standing in the Fourth Amendment context is not a threshold, jurisdictional question and need not be addressed before addressing other aspects of a Fourth Amendment claim, such as probable cause. See *Byrd v United States*, 584 US 395, 411; 138 S Ct 1518; 200 L Ed 2d 805 (2018). Nevertheless, we would conclude that defendant did not have standing to challenge the admission of Essex's journals.

---

[6] The trial court found the unpublished case *People v Ricketts*, unpublished per curiam opinion of the Court of Appeals, issued May 1, 2008 (Docket No. 276876), to be highly persuasive authority. "An unpublished opinion is not precedentially binding under the rule of stare decisis." MCR 7.215(C)(1). The trial court's reliance on *Ricketts* was also misplaced. This case is distinguishable from *Ricketts* because, in this case, the 911 call was made by the alleged victim of domestic assault, not an anonymous informant. Further, in this case, officers were aware assaultive behavior was reported.

"The state and federal constitutional protection against unreasonable search and seizure is personal and may only be invoked at the instance of one whose own protection was infringed by the search or seizure." *Gadomski*, 274 Mich App at 178 (quotation marks and citations omitted). "[A]n individual has no standing to challenge a search and seizure unless the person is present at the time of the search or asserts a possessory or proprietary interest in the property searched." *People v Rasmussen*, 191 Mich App 721, 725; 478 NW2d 752 (1991). "The defendant has the burden of establishing standing[.]" *People v Brown*, 279 Mich App 116, 130; 755 NW2d 664 (2008).

"[B]efore a defendant may attack the propriety of a search or seizure, that search or seizure must have infringed upon an interest of the defendant which art 1, § 11 was designed to protect." *People v Smith*, 420 Mich 1, 28; 360 NW2d 841 (1984); see also Const 1963, art 1, § 11.

> In determining whether a person has a legitimate expectation of privacy so as to confer standing to challenge a search and seizure as violative of the Fourth Amendment, a two-part inquiry is employed. First, a defendant must demonstrate that, under the totality of the circumstances, there existed a legitimate personal expectation of privacy in the area or object searched. Second, the individual's expectation must be one that society accepts as reasonable. The Fourth Amendment right to freedom from unreasonable searches and seizures is personal, and the defendant bears the burden of proving standing as a result of a personal expectation of privacy. [*People v Lombardo*, 216 Mich App 500, 504-505; 549 NW2d 596 (1996) (internal citations omitted).]

In this case, defendant was driving a vehicle registered in Roy's name. Defendant admitted to officers he did not have a driver's license. The LEIN inquiry obtained by officers confirmed that defendant was driving without a license. It is unclear from the record whether Roy gave defendant permission to drive the vehicle. After defendant was arrested, the vehicle was impounded because no licensed drivers were available to drive the vehicle.

During the inventory search of the impounded vehicle, officers found black bags in the trunk of the vehicle, containing personal items, such as laptops and slippers. Essex's journals were also found in one of the bags. Under the totality of the circumstances, defendant lacked standing to challenge the admission of Essex's journals. Defendant failed to demonstrate that he had a legitimate personal expectation of privacy. Although defendant asserted that the bags found in the trunk of the vehicle belonged to him, defendant offered no proof of ownership. Defendant failed to prove that he had a possessory or proprietary interest in the vehicle or the bags. Further, the expectation of privacy is not one society would generally find to be reasonable. The vehicle that defendant was driving was not registered in his name, it is unclear if he had permission to drive the vehicle, and defendant was driving without a driver's license. In summary, defendant failed to present evidence establishing that he possessed standing to challenge the search. Accordingly, the trial court erred in holding that defendant had standing to challenge the admission of Essex's journals.

## IV.  CONCLUSION

We reverse the trial court's order suppressing evidence obtained from defendant's vehicle and person, and remand for further proceedings.  We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Kathleen Jansen
/s/ Allie Greenleaf Maldonado