*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v

PAUL LAMOUNT GOREE,

Defendant-Appellee.

UNPUBLISHED
September 22, 2022

No. 357302
Wayne Circuit Court
LC No. 18-009718-01-FH

Before: M. J. KELLY, P.J., and MURRAY and BORRELLO, JJ.

BORRELLO, J. (*dissenting*).

As the majority acknowledges, "[t]he touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " *Pennsylvania v Mimms*, 434 US 106, 108-109; 98 S Ct 330; 54 L Ed 2d 331 (1977), quoting *Terry v Ohio*, 392 US 1, 19; 88 S Ct 1868; 20 L Ed 2d 889 (1968). Thus, when deciding a search and seizure issue, the focus must, at least initially, be on the reasonableness of the police actions. As stated by the Supreme Court, reasonableness is the "central inquiry under the Fourth Amendment." *Terry*, 392 US at 19.

Here, my reading of the majority opinion leads me to conclude that it is constitutionally permissible for a police officer, in their sole discretion, to prolong a traffic stop until the officer takes advantage of the opportunity to order the occupants out of the vehicle. Not only is the result conjured up by the majority contrary to Fourth Amendment precedents, see, *infra*, such a result is unreasonable. Simply stated, *Mimms* does not bestow on police officers the authority to prolong a traffic stop for as long as they desire for the sole purpose of ordering occupants out of the motor vehicle. Clearly, such a holding runs afoul of the Fourth Amendment's "reasonable" limitations on the scope of a seizure. See *id*. at 17 ("And by suggesting a rigid all-or-nothing model of justification and regulation under the Amendment, it obscures the utility of limitations upon the scope, as well as the initiation, of police action as a means of constitutional regulation."). See also *id*. at 19-20 ("And in determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, *and whether it was reasonably related in scope to the circumstances which justified the interference in the first place*.") (emphasis added). "The scheme of the Fourth Amendment becomes meaningful only

when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." *Id*. at 21. However, the majority's approach essentially insulates a police officer's conduct in these circumstances from any judicial review and improperly requires absolute deference to the police officer's own discretion in judging the constitutionality of the officer's conduct. Because I disagree with their analysis and with the majority's interpretation of *Rodriguez v United States*, 575 US 348; 135 S Ct 1609; 191 L Ed 2d 492 (2015), I respectfully dissent.

Officer Jacob Esposito testified that after he stopped the vehicle at issue in this case for having an unlit license plate. Esposito approached the vehicle and requested that the driver produce his license, vehicle registration, and verification of insurance. According to his testimony, Esposito was the sole officer on the scene when he initiated the traffic stop. After all of the requested documents were presented to him, Esposito went to his police vehicle and verified the validity of the driver's license and that the vehicle was properly registered and insured. Esposito also verified that the driver did not have any active warrants. During this time while Esposito was in his police vehicle, the driver was still sitting in his own vehicle with defendant. Defendant was sitting in the front passenger seat. Esposito wrote the driver a traffic citation for the unlit license plate light.

Esposito testified that when he returned to the driver's vehicle to return the documents and deliver the citation, the driver appeared "nervous…[j]ust breathing heavy, kind of very uneasy, kind of, like, fidgety, shifty." Based on the driver's nervousness, Esposito ordered him out of the vehicle so he could "investigate the nervousness, why he was so nervous and fidgety." Next, Esposito observed defendant make a "furtive gesture towards the bottom of the seat or under the seat" that caused Esposito to redirect his attention to defendant and speak to him. Esposito testified that defendant "seemed a little nervous" and that he ordered defendant out of the vehicle. At some point, according to Esposito's testimony, another officer arrived on the scene in a separate police vehicle to stand with the driver while Esposito "went to contact the defendant." Esposito further indicated that he allowed defendant to remain seated in the vehicle for some amount of time after defendant made the "furtive gesture" before ordering defendant out of the vehicle, but Esposito could not recall how long this interval lasted. The events that unfolded as defendant got out of the vehicle led to the discovery of illegal substances.

Neither party disputes the legality of Esposito's initial decision to initiate the traffic stop based on the vehicle's unlit license plate, thereby commencing the seizure of the vehicle's occupants. *Arizona v Johnson*, 555 US 323, 327; 129 S Ct 781; 172 L Ed 2d 694 (2009) (stating that "a police officer effectively seizes 'everyone in the vehicle' for the duration of a traffic stop but that doing so constitutes a "lawful investigatory stop" if the officer is inquiring into a "vehicular violation"). However, "[i]t is . . . clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v Caballes*, 543 US 405, 407; 125 S Ct 834; 160 L Ed 2d 842 (2005). Specifically, a "seizure that is justified solely by the interest in issuing a . . . ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id*. The United States Supreme Court has explained:

A seizure for a traffic violation justifies a police investigation of that violation. "[A] relatively brief encounter," a routine traffic stop is "more analogous to a so-called '*Terry* stop' . . . than to a formal arrest." Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may "*last no longer than is necessary to effectuate th[at] purpose*." Authority for the seizure thus *ends* when tasks tied to the traffic infraction are—or *reasonably should have been*—completed. [*Rodriguez*, 575 US at 354 (alterations and ellipsis in original; citations omitted; emphasis added).]

In accordance with these principles, an officer conducting a traffic stop may detain the vehicle long enough to run a Law Enforcement Information Network ("LIEN") check, *People v Davis*, 250 Mich App 357, 364-368; 649 NW2d 94 (2002), and to ask reasonable questions concerning the alleged traffic violation "and its context for a reasonable period," *People v Williams*, 472 Mich 308, 315; 696 NW2d 636 (2005). "[W]hen a traffic stop reveals a new set of circumstances, an officer is justified in extending the detention long enough to resolve the suspicion raised." *Id*. However, although an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," the officer "may not do so in a way that prolongs the stop, *absent the reasonable suspicion ordinarily demanded to justify detaining an individual*." *Rodriguez*, 575 US at 355 (emphasis added).

The majority erroneously relies on *Mimms* and its progeny to support its conclusion that "Officer Esposito did not violate the Fourth Amendment by ordering the driver and defendant out of the vehicle." In *Mimms*, 403 US at 107, police officers stopped a vehicle with an expired license plate for purposes of issuing a traffic summons. Upon approaching the vehicle, one of the officers asked the respondent to get out of the car and produce his license and other documents. *Id*. As the respondent exited, the officer noticed a "large bulge" under the respondent's clothing that was subsequently discovered to be a firearm. *Id*. After the respondent's motion to suppress was denied, he was convicted of carrying a concealed deadly weapon and unlawfully carrying a firearm without a license. *Id*. The Supreme Court of Pennsylvania reversed the conviction on the ground that the "officer's order to respondent to get out of the car was an impermissible seizure" that violated the Fourth and Fourteenth Amendments "because the officer could not point to objective observable facts to support a suspicion that criminal activity was afoot or that the occupants of the vehicle posed a threat to police safety." *Id*. at 107-108 (quotation marks and citation omitted). In reversing the Pennsylvania Supreme Court, the United States Supreme Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Id*. at 111 n 6, 112.

Admittedly, the United States Supreme Court has explained that "*Mimms* itself drew a bright line" and that "the principles that underlay that decision apply to passengers as well." *Maryland v Wilson*, 519 US 408, 413 n 1; 117 S Ct 882; 137 L Ed 2d 41 (1997). In *Wilson*, the Supreme Court held that "a police officer may as a matter of course" order the driver and any passengers in "a lawfully stopped car" to exit the vehicle. *Id*. at 410.

Here, however, Esposito did not order the driver or defendant out of the vehicle "as a matter of course" at the outset of the traffic stop or while he was carrying out his mission of investigating the alleged traffic offense, even though he could have done so. Unlike the officer in *Mimms*, Esposito also did not claim that it was his "practice to order all drivers out of their vehicles as a matter of course whenever they had been stopped for a traffic violation." *Mimms*, 434 US at 110. Even though the rule set forth in *Mimms* does not require officers to have such a standard practice or any particularized suspicion of additional unlawful activity to justify ordering occupants to exit a vehicle during a lawful traffic stop, see *id.* at 109-110, 111 n 6; *Wilson*, 519 US at 410, it does not follow that there is no constitutional limit on an officer's authority to permissibly order an occupant to exit a vehicle after a legitimately instituted traffic stop has concluded.

Here, as the trial court correctly noted, prior to Esposito ordering the driver and then defendant out of the motor vehicle. Additionally, Esposito ran computer checks to ensure that there were no outstanding warrants for the driver and that the driver's license, registration, and insurance were all valid. Hence, by this juncture, Esposito had completed his investigation and his seizure of the motor vehicle and its occupants was no longer based on a reasonable suspicion that criminal activity was afoot. It was only after Esposito wrote a citation for the driver, returned to the vehicle to deliver the citation and return the driver's documents, that he *then* decided to ask the driver to get out based on his appearance of nervousness. Hence, the question then arises as to whether the trial court correctly determined that Esposito, after writing a citation and verifying the driver's licensure, vehicle registration, and lack of any outstanding warrants, was justified in prolonging the stop. See *Rodriguez*, 575 US at 354. Principally, did the observed behavior of the driver constitute reasonable suspicion such that the stop could be prolonged. See *id*. at 355.

In *Caballes*, 543 US at 407, the United States Supreme Court addressed the question "[w]hether the Fourth Amendment requires reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop." (Quotation marks and citation omitted.) In that case, the respondent was stopped for speeding and the Court proceeded on the assumption that the police did not have any other information about the respondent. *Id*. at 406-407. While one police officer was in the process of writing a ticket, another officer walked a narcotics-detection dog around the outside of the respondent's car. *Id*. at 406. After the dog alerted at the trunk, the officers searched the trunk and found marijuana. *Id*. The United States Supreme Court accepted the lower court's factual findings from the record evidence "that the duration of the stop in this case was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop." *Id*. at 408.[1] On that basis, the *Caballes* Court held that a "dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Id*. at 410.

---

[1] My colleagues in the majority, rather than accepting the trial court's findings—which are amply supported by the record—that the entire duration of the stop was not justified solely by inquiries related to the mission of the traffic stop but was instead prolonged based on Esposito's observations of the driver's "nervousness," have essentially proceeded to make their own findings of fact that Esposito was still acting in the course of his traffic-offense-investigation mission.

Subsequently, in *Rodriguez*, 575 US at 353, the United States Supreme Court questioned whether police "may *extend* an otherwise-completed traffic stop, *absent reasonable suspicion*, in order to conduct a dog sniff." (Emphasis added.) The police officer in that case stopped a vehicle for unlawfully veering onto the shoulder of the highway. *Id*. at 351. The officer questioned the driver about the infraction and collected the driver's license, registration, and proof of insurance. *Id*. The officer conducted a records check in his patrol car and then returned to the detained vehicle where he asked the passenger for his driver's license and questioned the passenger about the occupants' travel itinerary. *Id*. The officer returned to his patrol car, completed a records check on the passenger, called for a second officer, and began writing a ticket for the driver. *Id*. The officer went back to the detained vehicle, issued the written warning, returned the driver's and passenger's documents, and then asked for permission to walk his dog around the vehicle. *Id*. at 352. The driver declined, and the officer instructed the driver to exit the vehicle and stand by the patrol car to wait for the second officer. *Id*. The officer's dog subsequently alerted to the presence of drugs, which were in turn located after a search of the vehicle. *Id*.

The United States Supreme Court held "that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures" and a "seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time *reasonably required* to complete th[e] mission of issuing a ticket for the violation." *Id*. at 350-351 (quotation marks and citation omitted; alterations in original; emphasis added). While an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*. at 355.

The distinction between the respective outcomes in *Caballes* and *Rodriguez* illustrates the crux of the issue in the instant case and the point on which I disagree with my colleagues. In *Caballes* and *Rodriguez*, the issue was not whether the officers could conduct a dog sniff of the vehicle—they generally could without violating the Constitution—but instead involved questions of *when* and *on what basis* a dog sniff could be permissible—i.e., officers could not conduct what would have otherwise been a permissible dog sniff if the mission of investigating an ordinary traffic offense should already have reasonably been completed before they conducted the dog sniff *unless there was reasonable suspicion to justify extending the detention of the vehicle's occupants*. Reading *Mimms*, *Wilson*, *Caballes*, and *Rodriguez* together yields the general principle that an officer does not need a specific reason to order an occupant out of a vehicle *during* a lawful traffic stop that is reasonable in scope and duration relative to the traffic-enforcement mission of the stop, but there must be the requisite reasonable suspicion to justify prolonging the stop after the point that it reasonably should have been over in order for an officer to then permissibly require the occupants to exit the vehicle. In short, application of reasonableness to our inquiry requires that the permissible authority to order the occupants out of the vehicle as a matter of course expires when the traffic stop should have reasonably been terminated.

My colleagues propose that the stop should not reasonably conclude until after the officers takes advantage of the opportunity to order the occupants out of the car as a matter of course. They are wrong. The majority appears to justify this position by citing *Johnson*, 555 US at 333 in support of the statement, "It is equally well-settled that a traffic stop is not over until the officer completes his investigation and releases the driver to leave." While true from a practical standpoint, the Supreme Court in *Johnson* unequivocally did *not* imply that all traffic stops are

constitutional in scope and duration from the time the vehicle is pulled over until the officer releases the driver. Rather, the *Johnson* Court's statement of the relevant legal framework is consistent with body of caselaw that I have already discussed:

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, *so long as those inquiries do not measurably extend the duration of the stop*. [*Id.* (citation omitted; emphasis added).]

Here, the trial court held that the stop of the motor vehicle went beyond what was reasonable and that the stop should have been terminated once Esposito knew that the driver had the proper license, was registered, insured and had no warrants—all of the relevant information which formed the basis for the stop—and had returned to the vehicle to issue the citation (which was already written) and return the driver's documents. The trial court's conclusion is supported both legally and factually. Thus, the question next becomes whether there was reasonable suspicion to justify prolonging the stop.

It was Esposito's contention that the stop could be prolonged because the driver looked nervous and defendant made a furtive movement. However, both of these observations occurred after the trial court concluded the stop should have been terminated. Additionally, the trial court held that neither basis, without any additional evidence, constituted reasonable suspicion to prolong the stop. Hence, the trial court held, by the time Esposito searched the motor vehicle, the constitutional violation had occurred.

The prosecutor, and my colleagues in the majority, disagree with the trial court's holding that Esposito's observation of the driver appearing "nervous" was insufficient to constitute reasonable suspicion to prolong the stop. The trial court held that being nervous did not constitute reasonable suspicion because there exists a certain amount of nervousness in any traffic stop, regardless of whether criminal behavior is afoot. It seems a matter of commonsense, and self-evident to me as well, that there is a certain level of nervousness associated with a police officer stopping a vehicle and asking the driver for their license, registration and proof of insurance. Hence it is difficult for me to conclude that nervousness alone, in the manner of "fidgeting," is sufficient to constitute anything more than a hunch when determining whether an officer has provided a legal basis for a finding of reasonable suspicion. "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *People v Oliver*, 464 Mich 184, 197; 627 NW2d 297 (2001) (quotation marks and citation omitted). Reasonable suspicion to detain an individual "entails something more than an inchoate or unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *People v Champion*, 452 Mich 92, 98; 549 NW2d 849 (1996) (citation omitted). To determine whether an officer acted reasonably, "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 US at 27 (citation omitted).

Additionally, the prosecution argues, Esposito testified that while he was watching the driver act "nervous" he saw defendant make a furtive movement. However, Esposito never saw defendant grab anything, never saw the presence of a weapon or narcotics until after Esposito told defendant to exit the vehicle. Our Supreme Court has held that furtive gestures alone are insufficient to establish a reasonable suspicion of criminal activity. See *People v Shabaz*, 424 Mich 42, 61; 378 NW2d 451 (1985). ("Because the police could only guess about what defendant was seeking to hide, their speculation did not provide a particularized suspicion of possessory wrongdoing, but only a generalized one.").

And, as previously stated, the presence of nervousness is of limited value. While the United States Supreme Court has recognized "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," *Illinois v Wardlow*, 528 US 119, 124; 120 S Ct 673; 145 L Ed 2d 570 (2000), it is only that—a factor. Indeed, other courts have stated nervousness "is an unreliable indicator, especially in the context of a traffic stop . . . [because] [m]any citizens become nervous during a traffic stop, even when they have nothing to hide or fear." *United States v Richardson*, 385 F3d 625, 630-631 (CA 6, 2004); see also *United States v Simpson*, 609 F3d 1140, 1147 (CA 10, 2010) (stating that "[n]ervousness is of limited value in assessing reasonable suspicion" because it is a common behavior, even for law-abiding citizens, "when confronted by a law enforcement officer" and "it is natural for a motorist to become more agitated as a stop is prolonged and particularly when the officer seems skeptical or suspicious"). Rather, "[a]n officer testifying that he inferred on the basis of his experience and training is obliged to articulate how the behavior that he observed suggested, in light of his experience and training, an inference of criminal activity." *People v LoCicero*, 453 Mich 496, 505-506; 556 NW2d 498 (1996).

Other than reporting defendant's alleged "furtive" gesture and that he appeared "a little nervous," Esposito did not sufficiently articulate how, based on his training and experience, these behaviors lead him to believe defendant or the driver were engaged in criminal activity.[2] Thus,

---

[2] Esposito testified:

> [*The prosecutor*]: So based off your training and experience, did that concern you that you were observing furtive gestures from the passenger in the vehicle, the defendant?
>
> *A*. It did.
>
> [*The prosecutor*]: And why is that?
>
> *A*. I wasn't sure what he was doing, what he was hiding, retrieving, just I wasn't sure.
>
> [*The prosecutor*]: And did you make any other observations about his behavior at any point?

the trial court did not err in concluding it was an unreasonable seizure because there is evidence showing the original purpose for the stop was resolved, or reasonably should have been resolved, and there is no evidence in the record demonstrating new facts which give rise to reasonable suspicion of additional criminal activity.  Consequently, it was also not error for the trial court to suppress the evidence under the exclusionary rule because the trial court determined the evidence flowed from an unreasonable seizure.  Because the trial court did not err in suppressing the evidence on the basis of an unreasonable seizure, it is unnecessary to consider the prosecution's additional arguments to the contrary, because they are premised on the supposition that Esposito's seizure of defendant was reasonable.[3]  Accordingly, I would affirm the trial court.

/s/ Stephen L. Borrello

---

*A.*  I mean, he seemed a little nervous.  I don't entirely recall exactly his demeanor.

[3] I note that contrary to the prosecution's argument, defendant has standing to challenge the constitutionality of the traffic stop because passengers in vehicles are "seized, just as the driver is, 'from the moment [a car stopped by the police comes] to a halt on the side of the road.' " *Johnson*, 555 US at 332 (alteration in original), quoting *Brendlin v California*, 551 US 249, 263; 127 S Ct 2400; 168 L Ed 2d 132 (2007).